### In re WHEELING–PITTSBURGH STEEL CORPORATION, et al., Debtor.

### Bankruptcy No. 85–793 PGH.

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 6, 1985.

See also, Bkrtcy., 54 B.R. 385.

George L. Cass, M. Bruce McCullough, and Stephen W. Johnson of Buchanan Ingersoll, P.C., Pittsburgh, Pa., for debtors.

Leon S. Forman, Peter E. Meltzer, Earl T. Stamm of Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Fireman's Fund Ins. Co., American Automobile Ins. Co., The American Ins. Co., Nat. Sur. Corp., and Associated Indem. Corp. ("Fireman's Fund Et. Al." or "Movants").

## MEMORANDUM OPINION AND ORDER ON MOTION FOR RELIEF FROM THE AUTOMATIC STAY FILED ON BEHALF OF FIREMAN'S FUND INSURANCE COMPANY, ET AL.

WARREN W. BENTZ, Bankruptcy Judge.

### Case Summary

On May 10, 1985, Fireman's Fund Et Al filed a Motion for Relief from the Automatic Stay ("Motion") to permit cancellation of certain insurance policies issued by them to the Debtors. A preliminary hearing was held on the Motion at which time testimony and documentary evidence were adduced. Thereafter, the parties submitted briefs. Having considered the testimony and documentary evidence introduced at the hearing, and the statements, arguments and briefs of counsel, the court finds the Movants' arguments for cancellation without merit. Accordingly, and for the reasons discussed below,[1] the court will deny the requested relief.

### Jurisdiction

This court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1334 and the General Order of Reference of the United States District Court for the Western District of Pennsylvania dated October 16, 1984 entered pursuant to 28 U.S.C. § 157. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(G).

### Facts

The debtors, Wheeling-Pittsburgh Steel Corporation and seven of its wholly-owned subsidiaries ("Debtors"),[2] filed petitions for reorganization under Chapter 11 of the Bankruptcy Code ("Code") on April 16, 1985 and currently operate steel making, mining and railway concerns as debtors in possession. The Debtors obtained various types of insurance coverage for their business operations from the Movants beginning as early as 1981. Movants now seek to cancel the only four insurance policies currently in force on the basis of alleged defaults in premium payments. The four policies at issue are: General Worker's Compensation Insurance (KWP2693313) (non-Pennsylvania occurrences); General Liability Insurance (KLA3215327); Automobile Insurance (KAB3480629); and Blanket Excess Liability Insurance (XLX173–32–69).

Pursuant to various premium payment agreements between Movants and the Debtors, as well as the policies of insurance themselves, Debtors are obligated to pay Movants two types of premiums: annual base premiums and retrospective premiums. The annual premium is an estimated annual premium, paid in installments, which is the base cost upon which the total cost of the insurance coverage is calculated. Approximately 18 months after the

---

1. This Memorandum Opinion constitutes this court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052 as made applicable to this contested matter by Bankruptcy Rule 9014.

2. The seven subsidiaries include Mingo Oxygen Co., Pittsburgh Canfield Corporations, W.P. Coal Company, Fort Duquesne Coal Company, Consumer Mining Company, Monessen Southwest Railway, and Three Rivers Coal Company. These proceedings have been consolidated by court order for administrative purposes.

inception of the particular insurance policy, a premium audit is prepared which computes actual losses covered to date, loss adjustment expenses, and applicable state taxes. Using this data, a retrospective premium formula is applied to determine what the retrospective premium will be for the given time period. This retrospective premium is then paid in addition to the base installment premium. Thereafter, at regular intervals, not uncommonly for 7–10 years after the expiration of the policy, the retrospective premium formula is calculated, and the insured pays this retro premium until all losses under the policy are finally settled. This type of coverage is known in the insurance business as a standard retrospective premium arrangement.[3]

One feature of the particular standard retro premium arrangement with the Debtors is the cross default provision found in each contract of insurance between Movants and the Debtors. Pursuant to this cross default scheme, a default under any one policy will create a default under all other policies issued by the same insurer to the Debtors.

In addition to the four insurance policies at issue, a fifth policy is relevant—a policy for Pennsylvania Worker's Compensation Insurance (KWP2693326). This policy was voluntarily cancelled by Debtors and Movants, and thus is not at issue in that respect. However, both parties concede that Debtors were in postpetition default of premium payments under this policy prior to its cancellation. On the basis of this default and on prepetition premium defaults under prior policies which have expired,[4]

Movants argue under various theories, discussed below, that the four policies at issue are in default and therefore are cancellable. Alternatively, Movants argue that if they are not permitted to cancel the policies, Debtors must immediately pay *all* premiums due under all policies as consideration for future coverage. These premium payments would include base and retrospective premiums for the four current policies at issue as well as pre-petition premiums for prior years standard retro policies which have expired but which still have unsettled losses. These premiums for pre-petition losses would amount to some $5,942,086.

A preliminary hearing on the Motion was held on May 22, 1985. On June 10, 1985, within 30 days of the filing date of the Motion, the court issued an order from Erie, Pennsylvania, extending the automatic stay with respect to the insurance policies. However, the court's telecopier was not operational on June 10th and consequently, this order was not docketed in Pittsburgh until June 12, 1985 (more than 30 days after the Motion was filed).

On August 2, 1985, while the instant Motion was still under consideration by the court, Fireman's Fund Et Al filed a motion to vacate the court's June 10th order extending the automatic stay. Movants asserted that the June 10th order was invalid as a matter of law under § 362(e) of the Code because it was entered more than 30 days after the filing of the Motion for Relief from Stay. The parties filed briefs on this issue and the court took the matter under advisement.

---

**3.** The standard retrospective premium arrangement is in contrast to a standard premium arrangement under which the insurer estimates a premium charge, not subject to retrospective adjustment, and charges that fixed premium for a given contract of insurance. Under a standard retrospective premium arrangement, there is a maximum premium cap which is the point at which the insured's obligation to pay premiums to the insurer ceases. The Blanket Excess Liability Policy and the Automobile Policy were not part of the standard retrospective arrangement; both were fixed premium policies. The Pennsylvania Worker's Compensation Policy, the Worker's Compensation Policy for non-

Pennsylvania occurrences and the General Liability Policy, on the other hand, were standard retrospective premium policies.

**4.** In previous years, Movants issued other insurance policies to Debtors under Standard retrospective premium arrangements. Under the Standard retrospective arrangement, although these policies have expired, the Debtors remain liable for retrospective premium payments until all losses are settled. Movants argue that Debtors are also in default of premium payments under these policies.

*Issues*

1. Are the four insurance policies in default such that Movants would be entitled to cancel these policies under principles of contract law outside of bankruptcy?

(a) Are the four policies in actual default?

(b) Are the four policies in default pursuant to the cross default provisions contained in each policy?

(c) Are the four policies in default pursuant to the theory that all the insurance policies issued by Movants to Debtors constitute one comprehensive insurance package under which default in any one policy creates a default in the entire insurance package?

2. If any of the policies are in default, does the automatic stay prevent Movants from cancelling these policies?

3. If the automatic stay prevents cancellation, is § 362(e) applicable to unsecured creditors such that the automatic stay terminated by operation of law with respect to Fireman's Fund Et Al upon the court's failure to docket its June 10th order before the expiration of the thirty day period?

4. If § 362(e) is not applicable to unsecured creditors and thus the automatic stay remains in effect, are Movants entitled to relief from the Automatic Stay pursuant to § 362(d) for "cause" in order to cancel the insurance policies?

*Discussion*

Movants argue that the four insurance policies are in default under basic principles of contract law outside of bankruptcy, and that the automatic stay does not prevent them from cancelling the policies. Alternatively, Movants argue that if the automatic stay prevents cancellation, the stay terminated by operation of law pursuant to § 362(e) when the court failed to docket its June 10, 1985 order within 30 days of the

filing date of the Motion. Alternatively, if the automatic stay did not terminate by operation of law pursuant to § 362(e), Movants argue that they are entitled to relief from the automatic stay for cause in order to cancel the four policies.

Debtors, on the other hand, argue that none of the four policies are in default; that the automatic stay prevents Movants from cancelling the policies; that the 30 day time period in § 362(e) applies only to secured creditors and is therefore unavailable to Movants, who are unsecured creditors; and that no cause exists to grant Movants relief from the automatic stay to cancel the four policies.

Movants' asserted right to cancel the four policies is premised solely on the ground that the policies are in default, thereby entitling Movants to cancel pursuant to the terms of each policy. If none of the policies are in default, Movants, under basic principles of contract law, are not entitled to cancel the policies. If Movants in the first instance are not entitled to cancel the policies under nonbankruptcy law, the issues of 1) whether the automatic stay precludes cancellation, 2) whether the automatic stay terminated by operation of law pursuant to § 362(e) and (3) whether Movants are entitled to relief from the stay to cancel the policies become moot. The threshold question, then, is whether one or more of the four policies is in default.[5]

Movants advance three arguments in support of their position that the four policies are in default: First, that the four policies themselves are in actual default; second, that the four policies are in default by virtue of the cross default provisions found in each policy; and third, that the four policies are in default because all insurance agreements between the parties constituted one comprehensive nonseverable insurance program pursuant to which a default in any one insurance policy creates a default in the entire insurance program.

---

**5.** "Actual default" is used here in contradistinction to default pursuant to a cross default clause. "Actual default" means that there is a default in the policy itself (e.g. non-payment of premiums) as opposed to a default in a policy not otherwise in default which has been triggered by a default in another policy via a cross default clause.

Each of these theories is now considered in turn.

### I. Actual Default Under Each Policy

On the issue of actual default under the policies, the testimony and evidence revealed the following: The Blanket Excess Liability Policy is a fixed premium policy (i.e., not a standard retrospective policy) and was paid up front in full. Therefore, this policy is not in default.

On May 1, 1985, the Debtors tendered a check for installment premiums due on that date under the General Worker's Compensation Policy (non-Pennsylvania occurrences), the General Liability Policy, and the Automobile Insurance Policy. Movants, however, returned the check stating that defaults under the policies issued in prior years (i.e., failure to pay now for prior years' losses) as well as the post-petition default under the Pennsylvania Worker's Compensation Policy triggered the cross default provisions in all the insurance policies. Consequently, Movants argue, the Debtors were immediately liable for accelerated premiums due under all of the current policies as well as under policies issued in prior years. Relying on this theory, Movants refused to accept the tendered premiums unless Debtors agreed in writing that Movants' acceptance of the check would be without prejudice to claim the remaining amounts alleged to be due. Debtors refused to accede to the Movants' request on the ground that the cross default provisions were invalid in bankruptcy. Consequently, Debtors have made no further premium payments under the current agreements.

■ It bears emphasizing that the Debtors were ready, willing and able to make the usual monthly premium payments under the current policies. The Movants have declined to accept these payments. Perhaps the Debtors ought to have complied with the Movants' benign request. However, the Debtors were not required by law

to do so. In any event it is well established, and the bankruptcy court as a court of equity would have recognized, that Movants' acceptance of the check was without prejudice to claim further amounts alleged to be owed. Movants could have requested an order of court to this effect if they felt the need, but they did not do so. Under these circumstances, the non-payment of postpetition premiums ordinarily due under these three policies has not been due to any fault of the Debtors. Therefore, the court finds that these three policies themselves are also not in default.

### II. Default Under Cross-Default Provisions

Movants assert that the four policies can be cancelled for the non-payment of premiums due under the terms of other policies issued by Movants, including defaults in the payment of premiums due on the Pennsylvania Workers' Compensation Policy and defaults on various policies issued in prior years which are now expired. The device upon which Movants rely in making this assertion is known as a "cross-default" provision.

At least one court has held cross default provisions unenforceable in a leasehold context. *See In re Sambo's Restaurants, Inc.*, 24 B.R. 755 (Bankr.C.D.Cal.1982). In *Sambo's*, the debtor defaulted in the payment of rent under two leases but continued to operate and pay rent under eight other leases. Each lease provided that a default under one lease was a default under all leases. The lessor asserted that the debtor could not assume or assign any of the leases without assuming all of them, and in so doing, curing the defaults on all of the leases. The court, however, held that the cross default provisions in the leases were unenforceable. *Id.* at 757.

The court in *Sambo's* reasoned that the limitations on the ability to assume and assign executory contracts and unexpired leases are found only in § 365(c) [6] and that

---

**6.** Section 365(c) states that:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the

any contractual restriction on assumption and assignment other than those specified in § 365(c) is proscribed in § 365(f)(1).[7] The court then found that the cross default provisions impermissibly restricted the debtor's right to assign its unexpired leases. Accordingly, the court held the particular cross default provisions unenforceable.

■■■■ This court does not read *Sambo's* to mean that all cross default provisions are unenforceable in bankruptcy under all circumstances as a matter of law. Rather, the court in *Sambo's* invalidated those particular cross-default provisions because they restricted the debtor's ability to assume and assign its unexpired leases in violation of § 365(f). Consistent with this reasoning, cross default provisions would be enforceable in bankruptcy where they do *not* restrict the debtor's ability to assume and assign executory contracts and unexpired leases. This reasoning is also consistent with the policy underlying the prohibition of *ipso facto* or bankruptcy termination clauses under § 365(e). The policy underlying the prohibition of bankruptcy termination clauses under § 365(e) is that such clauses restrict the debtor's ability to assume and assign executory contracts and leases where doing so would benefit the estate, thereby hampering the Debtors' rehabilitation efforts. However, the legislative history to § 365 emphasizes that § 365(e) does not limit the application of bankruptcy termination clauses in all situations:

> This subsection does not limit the application of an *ipso facto* or bankruptcy clause if a new insolvency or receivership occurs after the bankruptcy case is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of disposition of the executory contract or unexpired lease.

Report of the Committee on the Judiciary, United States Senate, to accompany S. 2666, S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978) U.S.Code Cong. & Admin.News 1978, p. 5787 ("S.Rep."); Report of the Committee on the Judiciary, House of Representatives, to accompany H.R. 8200, H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5963 ("H.R.Rep."). Therefore, § 365(e) does not limit the application of a bankruptcy termination clause if a new insolvency or receivership occurs, or if the bankruptcy termination clause does not affect the debtor's ability to assume and assign an executory contract or unexpired lease. Analagously, cross default provisions will be enforceable in bankruptcy where they relate to a new insolvency or receivership situation and where they do not affect the debtor's right to assume and assign executory contracts and unexpired leases.

Movants cite two cases for the proposition that cross default provisions are valid against a debtor in bankruptcy. *Northwest Recreational Activities*, 4 B.R. 43, 47 (Bankr.N.D.Ga.1980) and *Matter of Teletronics Services, Inc.*, 29 B.R. 139, 165 (Bankr.E.D.N.Y.1983). However, those cases are consistent with this court's interpretation of the *Sambo's* case and the policies underlying § 365. In *Northwest*

---

debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment; or (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or (3) such lease of nonresidential real property has been terminated under applicable nonbankruptcy law prior to the order for relief.

7. Section 365(f)(1) states that:

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

*Recreational,* the court allowed a cross default provision as part of the debtor's plan of reorganization. Pursuant to this cross default provision, a default in the plan as to one creditor constituted a default as to another creditor. The existence of a cross default provision in the debtor's plan of reorganization meant, of course, that the cross default provisions could not have interfered with the debtor's right to assume or reject executory contracts under § 365 since such contracts, if any, would have been assumed or rejected before the confirmation date of the plan or would have been dealt with in the plan itself. Indeed, the court made no mention of any executory contracts.

■ In *Teletronics,* loan agreements and the security agreement thereto were interrelated by a cross default clause pursuant to which default under the loan agreements constituted a default under the security agreement. The borrower was in receipt of the loan funds and was making payments under the various loan notes when it failed to make an interest payment, thereby falling into default under the notes. The court stated, without discussion, that when the borrower went into default of the loan notes, it contemporaneously went into default of the security agreement. *Teletronics* is readily distinguishable, however, from the facts of the instant case inasmuch as the promissory notes were not executory contracts. The only performance remaining due under the promissory notes was repayment by the borrower. The legislative history to § 365 is clear on this point:

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which perform-

ance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

S.Rep. at 58, U.S.Code Cong. & Admin. News 1978, p. 5844; H.R.Rep. at 347, U.S. Code Cong. & Admin.News 1978, p. 6303. Unlike the promissory notes in *Teletronics,* the current insurance policies at issue here, with the exception of the Blanket Excess Liability Policy,[8] are executory contracts. The Debtors have a continuing obligation to pay their premium obligations, and Movants have a continuing obligation to provide insurance coverage. As discussed below, the court finds that these policies are separate for purposes of assumption and rejection. However, if the cross-default provisions in all of these policies were to be given effect, Debtors would be unable to assume and assign any of these policies without assuming *all* of them and in so doing, curing *all* defaults under *all* the policies. This would impermissibly restrict the Debtors' ability to assume some of the policies and reject others. Therefore, the cross default provisions at issue are unenforceable in bankruptcy.[9]

■ It may be argued that since the Blanket Excess Liability Policy is not an executory contract, the cross default provision found therein ought to be given effect under the above analysis. However, the argument is unavailing. The Blanket Excess Liability Policy does not contain the same type of cross default provisions found in the other policies. Pursuant to paragraph 8 of the Blanket Excess Liability

8. Debtors paid the premiums for the Blanket Excess Liability Policy up front in full, and Movants have continued to provide insurance coverage under this policy. Thus, no "performance remains due to some extent on both sides."

9. *Teletronics* is distinguishable from the instant case on yet another ground. A loan agreement and accompanying security agreement are inherently related in a way that separate policies

of insurance and separate leases are not. A security agreement is not severable from the debt which it secures, thereby rendering a loan agreement and security agreement two sides of the same coin. So in essence, the clauses in *Teletronics* were not really cross default provisions at all, at least not the type of cross default provision found in *Sambo's, Northwest Recreational* and the instant case.

Policy, the Blanket Excess Liability Policy is predicated and conditioned upon the Debtors' underlying umbrella insurance policies remaining in effect such that the Blanket Excess Policy terminates upon the cancellation or termination of the underlying umbrella policies. Debtors' underlying umbrella insurance policies, in turn, are predicated and conditioned on Debtors' General Liability Policy remaining in effect. Thus, according to its own terms, the Blanket Excess Liability Policy is cancelled when the General Liability Policy is terminated. Since the court has found that the General Liability Policy is not itself in default and is not otherwise cancellable pursuant to the cross default scheme, there are no grounds for terminating the General Liability Policy. Therefore, there is no justification for cancelling the Blanket Excess Liability Policy.

For the above stated reasons, the court finds the cross default scheme at issue to be unenforceable.

### III.  Comprehensive Insurance Package

Movants' final argument is that all of the various insurance policies constitute one comprehensive nonseverable insurance program pursuant to which default under any one insurance policy constitutes a default of the entire insurance program. Alternatively, Movants argue that if the policies are not deemed to be one comprehensive nonseverable program, that certain groups of policies constitute an insurance package pursuant to which a default under any one policy in the package constitutes a default of the entire package. Debtors, on the other hand, argue that the policies are separate from one another such that default in one policy does not render any other policy in default.

■ Assuming *arguendo* that policies from prior years and the four policies at issue comprise one comprehensive nonseverable insurance program, a *post* petition default in this program is a necessary prerequisite to cancellation of the four policies. A prepetition default would simply leave Movants with a prepetition general unsecured claim which would be treated, along with other unsecured claims, in the Debtors' plan of reorganization. A prepetition default, however, would not entitle the Movants to now cancel the four policies if the policies are not in post petition default.

■ As was discussed earlier, the only insurance policy in post-petition default was the Worker's Compensation Policy for Pennsylvania occurrences which was voluntarily terminated by the parties. The question, then, is whether the four current policies at issue and the Pennsylvania Worker's Compensation Policy constituted one nonseverable package of insurance under which the post-petition default in the Pennsylvania Worker's Compensation Policy created a default in the other four policies.

After reviewing the testimony and documentary evidence adduced at the hearing, the court finds that the four current policies and the Pennsylvania Worker's Compensation Policy do not constitute one nonseverable package. First, the Blanket Excess Liability Policy and the Automobile Policy were not part of the standard retrospective arrangement; both were fixed premium policies. The Pennsylvania Worker's Compensation Policy, the Worker's Compensation Policy for non-Pennsylvania occurrences and the General Liability Policy, on the other hand, were standard retrospective premium policies. Second, there are separate premium payment agreements for the Pennsylvania Worker's Compensation Policy and the other policies. It is true that one premium payment agreement covers the Worker's Compensation Policy for non-Pennsylvania occurrences as well as the General Liability Policy. However, this would only support the argument that *these* two policies constitute one insurance package; but neither one of these policies is in default, and without some connection to the Pennsylvania Worker's Compensation Policy which was in default, Movants' theory fails. Third, the period of coverage for the Pennsylvania Worker's Compensation Policy is from July 15, 1984 to July 15, 1985. The periods of coverage for the General Liability Policy, the Automobile Policy

and the General Worker's Compensation Policy (non-Pennsylvania occurrences), and the Blanket Excess Policy were the same—from January 1, 1985 to January 1, 1986. Again, this may indicate that the latter four policies comprised one insurance package, but the crucial policy, the Pennsylvania Worker's Compensation Policy, clearly has a different period of coverage which indicates that it was a separate policy. Fourth, each of the policies has a separate and different policy number. Fifth, Movants' exhibit number 24, which is a schedule of premiums segregated into separate programs, places the Pennsylvania Worker's Compensation Policy in one program category and places the non-Pennsylvania Worker's Compensation Policy, the General Liability Policy, and the Automobile Policy in another category. Presumably the Blanket Excess Liability Policy is not included on the exhibit since that policy, unlike the others, was paid up front in full. Moreover, a "plan total" and "maximum premium cap" is shown for the plan category which includes the three policies, but no such calculations are shown for the Pennsylvania Worker's Compensation plan category.

For these and other reasons the court finds that for purposes of analyzing Movants' theory of default pursuant to a comprehensive nonseverable package of insurance, the crucial policy, the Pennsylvania Worker's Compensation Policy, is separate from the four policies sought to be cancelled. Therefore, assuming *arguendo* that the four policies constitute a nonseverable package of insurance, there has been no postpetition default therein which would entitle Movants to cancellation. It may become necessary in the future for the court to determine which of the insurance policies, if any, actually constitute a package for purposes of assumption or rejec-

tion. However, that issue need not be resolved today.

### Conclusion

Since Movants have failed to establish a postpetition default in any of the four policies, it is unnecessary to reach the issues regarding the automatic stay, the asserted lapse thereof, and the asserted right to relief therefrom. For the foregoing reasons, the Motions of Fireman's Fund Et Al for Relief from the stay are hereby denied. Debtors are hereby ordered to tender in full postpetition payments due to Movants under the four policies, excluding any premium payments calculated inconsistently with this decision, within 15 days of the billing dates on such premium invoices; such payments shall constitute an administrative expense of the Debtors' estates, and shall be received by Movants without prejudice to any claims they may pursue.[10]

---

10. Movants suggest at the end of their brief that they are entitled to assurance of future performance by the Debtors. Inasmuch as Movants' exposure under the current retrospective policies may extend for years into the future, perhaps to a point in time where the Debtors have

been liquidated or are otherwise unable to meet their retrospective premium obligations, the Movants' argument may have merit. Therefore, the court will entertain a motion for such assurance if one is filed.