**In the Matter of Martin KOPEL and Martin Kopel, Dvm, P.C., Debtors.**

**Martin Kopel and Martin Kopel, DVM, P.C., Plaintiffs,**

**v.**

**Pasquale Campanile a/k/a Pat Campanile, Pasquale Campanile P.C. and Overbaugh Real Estate Corp. Defendants.**

**Bankruptcy Nos. 197–15804–575, 197–15805–575.**
**Adversary No. 198–1006–575.**

United States Bankruptcy Court, E.D. New York.

March 1, 1999.

Ackerman Law Firm, LLC by Neil H. Ackerman, Marianne J. Gallipoli, Westbury, NY, for Plaintiffs.

Bruce H. Roswick, New York City, for Defendants.

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LAURA TAYLOR SWAIN, Bankruptcy Judge.

Before the Court are cross motions for summary judgment by plaintiffs Martin Kopel ("Kopel") and Martin Kopel, DVM, P.C. ("Kopel P.C.") (collectively, the "Plaintiffs" or "Debtors") and defendants Pasquale Campanile ("Campanile"), Pasquale Campanile P.C. ("Campanile P.C.") and Overbaugh Real Estate Corporation ("Overbaugh") (collectively, the "Defendants" or "Campanile Entities"). The principal dispute between the parties concerns prerequisites to the assumption of a non-residential real property lease between Overbaugh and Kopel, dated August 23, 1988 (the "Lease"). Defendants' cross-motion on their counterclaim (which incorporates by reference their complaint in *Overbaugh Real Estate Corp. v. Martin Kopel* (Adv.Proc. No. 198–1039–575)) seeks a declaration that the Lease can be assumed only if Kopel's defaults under a promissory note executed contemporaneously by Kopel and payable to Campanile P.C., dated August 23, 1988 (the "Note"), and a consulting agreement between Kopel and Campanile, also dated August 23, 1988 (the "Consulting Agreement"), are cured, because a cross-default provision in the Lease deems defaults under the Note and the Consulting Agreement to be defaults under the Lease. Payments under the Note and the Consulting Agreement are currently in substantial default. The Court previously granted Plaintiffs an extension of time in which to assume or reject the Lease pursuant to section 365(d)(4) of the Bankruptcy Code (11

U.S.C. § 365(d)(4)) pending a resolution of this adversary proceeding.

Plaintiffs seek a declaration that the cross-default provision is unenforceable. Plaintiffs also seek summary judgment avoiding an allegedly unperfected security interest, which was created by an asset acquisition agreement, dated August 23, 1988, and executed by Campanile P.C., Overbaugh, Campanile and Kopel (the "AAA") and a pledge agreement between Kopel and Campanile P.C. dated August 23, 1998 (the "Pledge Agreement"), in certain assets.[1] All of the foregoing agreements were entered into in connection with Kopel's purchase of a veterinary practice from the Campanile Entities.

Debtors filed their respective bankruptcy cases on May 22, 1997. Kopel P.C. has been making monthly rent payments pursuant to the Lease. Neither Debtor has been making payments under the Note or the Consulting Agreement (collectively, the "Non–Lease Agreements"). The arrears under the Note and the Consulting Agreement, calculated through May 1998, amounted to $63,000 and $57,000 respectively, and the combined arrears under these agreements are now approximately $175,000. The arrears under the Lease include a contractually deferred payment from May 1996.

Overbaugh, the landlord, is a real estate corporation created and wholly owned by Campanile. Campanile formed Overbaugh to acquire the premises located at 1909 Flatbush Avenue, Brooklyn, New York (the "Building") in 1981, and the Building remains Overbaugh's sole asset. Campanile maintained his veterinary practice in the Building, a veterinary hospital built in the 1950's, from the time Overbaugh acquired the Building until Campanile sold the practice to Kopel. Kopel leased the Building from Overbaugh in connection with his purchase of the practice. Debtors have been the exclusive occupants of the Building, pursuant to the Lease, since that time.

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of reference, dated August 28, 1986, of the United States District Court for the Eastern District of New York. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (K), and (O).

## BACKGROUND [2]

Kopel, a veterinarian, is the sole shareholder of Kopel P.C. d/b/a Gateway Veterinary Arts (the "Gateway Practice"). Campanile, a veterinarian and the sole shareholder of Campanile P.C. and Overbaugh, is Kopel's former employer and the former proprietor of the Gateway Practice. After Kopel had been in Campanile's employ for approximately eight years, Campanile decided to sell the Gateway Practice. In light of a working relationship that had developed during this time, Campanile offered the Gateway Practice to Kopel instead of seeking a third party

---

1. Kopel, as an individual, is the sole debtor party to the agreements. Kopel P.C. has, however, scheduled the assets covered by Campanile P.C.'s security interest on Schedule B (personal property) and the Lease on Schedule G (executory contracts and unexpired leases). The parties have proffered no evidence of an assignment or novation, and section 7.14 of the AAA provides that an assignment of Kopel's rights in the agreements does not absolve Kopel from liability thereunder. Because the situation is unclear and the parties have not distinguished between Kopel and Kopel P.C. in their papers on these issues, the Court will at times refer for convenience in this opinion to "Debtors" assump-

tion of the Lease. Use of the plural does not signify any determination by this Court as to the relationship of the individual debtor parties to any of the transactions discussed herein. Similarly, any reference to the assets as belonging to Kopel P.C. implies no determination that there has been a valid transfer. The Court assumes for purposes of this opinion that Campanile P.C. has retained rather than assigned its security interest.

2. Both parties rely on the transaction documents submitted by Debtors. The Court has also taken into account an affidavit submitted by Campanile and admissions in pleadings.

purchaser. Due to Kopel's financial circumstances, Campanile provided seller-financing for the transaction.

The transaction is described in the Preliminary Statement to the AAA as follows:

[Kopel] is employed by [Campanile P.C.] and desires to purchase the assets of the Gateway Practice. [Kopel] thereafter desires to continue the practice and wishes to enter into certain agreements with Pasquale Campanile in connection therewith. [Kopel] desires to lease the building in which the business operates from Overbaugh. Overbaugh desires to lease the Gateway Building to [Kopel].

In order effectuate the transaction, the parties executed the following documents, all of which are dated August 23, 1988: the AAA, the Lease, the Note, the Consulting Agreement and the Pledge Agreement.

Following defaults by Kopel, a number of the terms of the Lease, the Note and the Consulting Agreement were amended as of January 1, 1994. These amendments resulted in substantial savings to Kopel and included the waiver or deferral of certain obligations in the event that Kopel made timely payments. The parties executed a second Lease Amendment on October 25, 1995.

At the closing of the original transaction, Kopel tendered $75,000 for the assets of the veterinary practice. The remaining $350,000 of the $425,000 purchase price was represented by the Note. The Note initially provided for amortization over 15 years at 12% interest per annum. The 1994 amendment permitted Kopel to defer six payments, interest free, for over 10 years. In addition, the amendment permitted the Note payments due in January and February of each year to be deferred, without interest, until March 1, 2004, provided that Kopel timely made payments during the preceding year and that the Lease and Consulting Agreement were not in default.

The Consulting Agreement contemplates Campanile's provision of consulting services, imposes a restriction on Campanile's ability to compete with Kopel, and provides for an annual salary. The 1994 amendment reduced the annual salary from $40,000 to $38,000 and added a cross-default provision, the invocation of which would relieve Campanile of his agreement not to compete and would, moreover, bar Kopel's practice of veterinary medicine within a five-mile radius of the Gateway Practice.

The Lease, as amended in 1994, expires on December 31, 2005. Monthly rent for the remainder of its term is $9,800. The Lease includes a prospective rent abatement for the annual January and February fixed rent payments provided that all charges under the Lease are timely paid in the preceding year.

The Campanile Entities argue that the cross-default provision in the Lease is enforceable and thus mandates the cure of any default under the Non–Lease Agreements in connection with the assumption of the Lease. They also contend that the Lease and the Non–Lease Agreements document a single, unified transaction such that Debtors cannot retain their rights under the Lease without performing their obligations under the Non–Lease Agreements.

The Campanile Entities rely on the documentary evidence submitted by Debtors and have proffered an affidavit by Campanile. According to Campanile, he intended there to be "but one totally integrated complete transaction in which each document ... was dependent on and interrelated with all of the others." The documentary evidence is consistent with this stated intention. In addition to the Preliminary Statement in the AAA, numerous cross-references among the documents support the Campanile Entities' contention that the agreements together document a single transaction. Section 1.01 of the AAA, an outline of the transaction, provides for Campanile P.C. to sell the assets of the Gateway Practice to Kopel, for Kopel simultaneously to lease the

Building from Overbaugh and for the parties' entry into the other agreements provided for in the AAA. The Lease, the Note, the Pledge Agreement and the Consulting Agreement are annexed as exhibits A, E, F and G, respectively, to the AAA, and the execution of each of those agreements was expressly made a condition precedent to the closing under the AAA. AAA §§ 4.03, 5. Prior to the 1994 restructuring, the Lease and the Note were coterminous: the Lease had a 15 year term and the Note a 15 year repayment period. The AAA further provided that Kopel would practice veterinary medicine for at least 15 years. AAA § 3.03. However, prior to the 1994 amendments, the term of the Consulting Agreement was 10 years (the 1994 amendment extended its term for several months, through December 31, 1998).

Campanile, according to his affidavit, feared the possibility of Kopel's default under these agreements. Thus, he insisted on one essential condition. If Kopel were to default under any one agreement, Campanile would be able to recapture and recover the practice as a whole. Campanile believed he could only recover the real value of the Gateway Practice in the event of a default if he could quickly step in and operate the business. Kopel's acceptance of this condition was, Campanile asserts, the principal inducement for Campanile to go forward with the transaction. Campanile's uncontroverted affidavit asserts that Kopel understood and agreed to the entire arrangement.

Section 18.01 of the Lease sets forth the events of default. Pursuant to that section, a default under the Lease arises if, *inter alia:*

a default shall occur and continue beyond any applicable grace period under any Note or any other agreement between Pasquale Campanile P.C. and the Tenant [Kopel] or Pasquale Campanile related to the Consulting Agreement or the sale of the veterinary practice con-

ducted within the Premises and/or the Note delivered in connection therewith[.] Lease § 18.01(D). Each of the Note, the Pledge Agreement and the Consulting Agreement contains a similar provision.[3] In section 3 .04 of the AAA, Kopel granted Campanile P.C. a security interest in all of the assets of the Gateway Practice, entitling Campanile P.C. to recover the assets of the Gateway Practice if Kopel breached any obligation contained in the Note, the Lease or the Consulting Agreement. Section 3.04 of the AAA further provides that "[a]ny such default shall also constitute a default under the Lease." The Pledge Agreement provides that the assets of the Gateway Practice secure Kopel's performance under the Lease and the Non–Lease Agreements.

*DISCUSSION*

Summary judgment shall be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (made applicable to bankruptcy proceedings by Fed. R. Bankr.P. 7056). Summary judgment is inappropriate where there is sufficient evidence in the record to permit a reasonable fact finder to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *L.B. Foster Co. v. America Piles, Inc.,* 138 F.3d 81, 87 (2d Cir.1998). A court faced with a summary judgment motion "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Kerzer v. Kingly Manufacturing,* 156 F.3d 396, 400 (2d Cir.1998) (citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505 (1986)). Conclusory allegations, conjecture and speculation will not create a genuine issue of fact. *Kerzer,* 156 F.3d at 400. Summary judg-

---

**3.** The cross-default provision of the Consulting Agreement was added in 1994.

ment may be granted even where state of mind is at issue. *See Liberty Lobby,* 477 U.S. at 256–57, 106 S.Ct. 2505. The Court may consider the whole record, not just the evidence highlighted by the parties. *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1093 (5th Cir.1996).

The Court notes that Debtors have submitted no admissible evidence, other than the documents themselves, in support of their motion or in opposition to Campanile Entities' cross-motion. Rather, Debtors have proffered only arguments of counsel and a Local Bankruptcy Rule 7056–1 statement of purportedly undisputed facts without any evidentiary support, other than the transaction documents. The factual record before the Court is thus limited to the Campanile affidavit, the transaction documents themselves, and such admissions as may be contained in the pleadings.

Debtors, in a supplemental memorandum of law, have argued that additional extrinsic evidence is necessary to ascertain the parties' intent. Yet, they have neither offered any evidence nor sought a continuance to enable them to obtain further discovery. *See* Fed.R.Civ.P. 56(f). Kopel himself possesses the necessary knowledge of his intent and the parties' dealings. Like Campanile, he could have submitted an affidavit in support of his motion (and in opposition to Campanile's cross-motion) without formal discovery.

For the following reasons, the Court concludes that there is no genuine issue as to any material fact and that the Lease and the Non–Lease Agreements were entered into as part of a single, integrated transaction, such that the defaults under the Non–Lease Agreements must be cured as a condition to assuming the Lease. *See* 11 U.S.C. § 365(b). The Court also holds that Defendants' security interest in the assets held by Kopel P.C. is unperfected and is therefore avoided for the benefit of the estate.

## 1. *Prerequisites to Assumption of the Lease*

A debtor in possession may assume or reject executory contracts and unexpired leases. *See* 11 U.S.C. §§ 365, 1107. Here, Debtors will likely seek to assume the Lease while modifying their obligations under the Note and the Consulting Agreement. Before a debtor may assume any contract, it must, with limited exceptions, cure any default arising thereunder or provide adequate assurance of the prompt cure of such default. *See* 11 U.S.C. § 365(b). A default under one of the Non–Lease Agreements will therefore preclude assumption of the Lease, unless such default is cured, to the extent that the Bankruptcy Code permits enforcement of the cross-default provision.

■ Determining whether a particular cross-default provision is enforceable requires the balancing of two competing bankruptcy policies. *See In re Garrett Road Supermarket, Inc.,* 1988 WL 98777 (Bankr.E.D.Pa.1988). Generally, section 365(a) permits debtors to assume beneficial executory contracts and reject burdensome ones in order to facilitate reorganization. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1098 (2d Cir. 1993); *Phar–Mor, Inc. v. Strouss Building Associates,* 204 B.R. 948, 951 (N.D.Ohio 1997). The issue to be examined is whether enforcement of a cross-default provision, requiring the satisfaction of obligations under nominally separate contracts, would so contravene the policy of providing debtors an unrestricted right to assume and assign valuable contracts that such enforcement must be refused. *See Garrett Road,* 1988 WL 98777.

■ It is axiomatic that an executory contract generally must be assumed *cum onere. See National Labor Relations Board v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). A debtor cannot simply retain the favorable and excise the burdensome pro-

visions of an agreement. *See In re Village Rathskeller, Inc.,* 147 B.R. 665 (Bankr. S.D.N.Y.1992). Only certain contractual provisions, such as those expressly rendered unenforceable by the Bankruptcy Code, *see, e.g.,* 11 U.S.C. § 365(e)(1), or those that are designed to thwart bankruptcy policies, are vulnerable. *See Village Rathskeller,* 147 B.R. at 671–72. In limited circumstances, however, a court may exercise equitable discretion to refuse to enforce a provision where "there is no substantial economic detriment to the [non-debtor counterparty] shown and where enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Id.* at 672 (citing *In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1092 (3d Cir.1990)).

Section 365(f) generally permits a trustee or debtor in possession to assign a lease notwithstanding a provision in the agreement or of non-bankruptcy law that would prohibit, restrict or condition the assignment. 11 U.S.C. § 365(f). The only statutory exceptions to the relief from anti-assignment clauses are set forth in section 365(c). Cross-default provisions are not an enumerated exception. Several courts have held that cross-default provisions, such as section 18.01(D) of the Lease, impermissibly infringe upon the debtor's right to assume and assign leases. These courts have refused to enforce such provisions. *See, e.g., EBG Midtown South Corp. v. McLaren/Hart Environmental Engineering Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 597 (S.D.N.Y. 1992) ("Contractual limitations on the ability to assign unexpired leases other than those specified in § 365(c) are prohibited under § 365(f)."), *aff'd,* 993 F.2d 300 (2d Cir.1993).

Although, by its terms, section 365(f) applies to invalidate provisions restricting assignment, rather than assumption, of leases, the section is relevant to the assumption inquiry because section 365(f)(2)(A) requires assumption as a predicate to assignment of a contract. Several

courts have concluded that section 365(f) therefore prohibits the enforcement of a cross-default provision even where the debtor seeks only to assume, rather than to assume and assign, a contract. *See In re Madison's Partner Group, Inc.,* 67 B.R. 633, 635 (Bankr.D.Minn.1986) (alternate holding) (defaults under cross-defaulted agreement to which the lessor is not a party should not be subject to cure upon assumption of a lease except where (1) the lessor furnished special consideration in connection with the provision; or (2) the lessor's lease bargain would be prejudiced by non-performance); *In re Wheeling–Pittsburgh Steel Corporation,* 54 B.R. 772, 777–79 (Bankr.W.D.Pa.1985) (where enforcement of the cross-default provision would conflict with the debtor's ability to assume the contract, the provision will not be enforced), *aff'd,* 67 B.R. 620 (W.D.Pa. 1986); *In re Sambo's Restaurants, Inc.,* 24 B.R. 755, 757 (Bankr.C.D.Cal.1982) (cross-default provisions represent an impermissible restriction on the debtor's ability to assume and assign contracts). This result is consistent with the policy of protecting a debtor's right to assume beneficial contracts only.

■ Although cross-default provisions are inherently suspect, the Court does not read *Sambo's* and *Wheeling–Pittsburgh Steel* to counsel their *per se* invalidation. Before enforcing such a provision, however, a court should carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization. *See Garrett Road,* 1988 WL 98777; *Madison's Partner Group,* 67 B.R. at 635 (noting limited situations in which cross-defaults should be enforced); *Bistrian v. Easthampton Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co., Inc.),* 25 B.R. 193 (Bankr.E.D.N.Y.1982).

On facts analogous to those of the instant case, the bankruptcy court in *East-*

*hampton Sand & Gravel* rejected the debtor's contention that a note and a lease containing cross-default provisions could be assumed independently of each other. In that case, the debtor had leased a facility and purchased the business operated in it, giving the seller a note representing a substantial portion of the purchase price. The lease contained a cross-default provision rendering a default under the note a default under the lease. The court, while noting that it had equitable power to modify the lease's cross-default provision, refused to permit the debtor "to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy." *Easthampton Sand & Gravel*, 25 B.R. at 198. To do so, the court continued, would have denied the creditor the benefit of its bargain and resulted in a windfall for the debtor. *Id.*

■ The district court in *In re T & H Diner, Inc.*, 108 B.R. 448 (D.N.J.1989), reached a similar conclusion based on different reasoning. In *T & H Diner*, the debtor executed a series of promissory notes representing the purchase price of the business. The debtor's restaurant operated in premises leased from the former owner. The *T & H Diner* court found that the lease and a series of notes issued pursuant to a purchase agreement formed one indivisible agreement constituting a single contract for purposes of state law.

Thus, the debtor's default under the notes precluded the debtor's assumption of the lease.[4] *Id.* at 453–54.

Courts have refused to enforce cross-default provisions in situations where the cross-defaulted agreements are not interrelated. For example, in *Wheeling–Pittsburgh Steel*, the non-debtor party moved for relief from the automatic stay so as to permit it to cancel four insurance policies. However, there had been no actual default under any of the four policies at issue. The court concluded that the four policies did not form a nonseverable insurance package with a policy that was in default, and refused to enforce a cross-default provision linking those four policies with the policy that was in default. *See Wheeling–Pittsburgh Steel*, 54 B.R. at 780–81. Similarly, the district court in *Sanshoe*, prior to declaring the cross-default provision unenforceable, determined that leases of different floors in a commercial building constituted separate agreements that were not to be construed as a single contract under the factual circumstances of that case. *See Sanshoe*, 139 B.R. at 596.

■ An overriding principle can be gleaned from these and similar cases: Federal bankruptcy policy is offended where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement. A creditor cannot use the protections afforded it by section 365(b) (which requires curing of de-

4. Where several documents are construed as one contract, the debtor must assume or reject them together. *See Pieco, Inc. v. Atlantic Computer Systems, Inc. (In re Atlantic Computer Systems, Inc.)*, 173 B.R. 844, 849 (S.D.N.Y.1994); *see also Progressive Restaurant Systems, Inc. v. Wendy's International, Inc. (In re Progressive Restaurant Systems, Inc.)*, 1997 WL 251508 (W.D.N.Y.1997). The five documents here at issue all have New York choice of law provisions, and their construction is governed by New York law. *See Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re S.E. Nichols Inc.*, 120 B.R. 745, 748 (Bankr. S.D.N.Y.1990). Because the Lease includes

an express cross-default provision that this Court holds is enforceable, the Court need not reach the issue of whether the transaction documents ought to be construed as one contract under New York law. *See Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972); *BWA Corp. v. Alltrans Express U.S.A. Inc.*, 112 A.D.2d 850, 852, 493 N.Y.S.2d 1,3 (1st Dep't 1985); *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 439–40, 445 N.Y.S.2d 172, 175 (2d Dep't 1981). *See also Commander Oil Corp. v. Advance Food Service Equipment*, 991 F.2d 49, 53 (2d Cir.1993); *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir.1991).

faults and adequate assurances of future payments as a precondition to assumption of an executory contract or unexpired lease) in order to maximize its returns by treating unrelated unsecured debt as a *de facto* priority obligation. Thus, where the non-debtor party would have been willing, absent the existence of the cross-defaulted agreement, to enter into a contract that the debtor wishes to assume, the cross-default provision should not be enforced. However, enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain.

The Court will now examine the relationship of the Lease to the Non–Lease Agreements.

### A. The Lease and the Note

■ Debtors argue that the cross-default provision of the Lease should not be enforced because the Lease, viewed in isolation, does not indicate that it is part of an integrated transaction and the Lease is supported by independent consideration—the "demise of the [Building] and the rents, covenants and conditions contained [therein.]" Indeed, the only references, other than in the cross-default provision, to the larger transaction in the Lease itself are (i) a use restriction, which provides that "[t]he Building may be used and occupied for the practice of veterinary medicine and any related activities only"; and (ii) a provision that Overbaugh may not withhold unreasonably its consent to an assignment or sublet if the assignee or sublessee assumes the obligations under the Lease, the Note and the Consulting Agreement. Lease §§ 4.01, 27.03(d). Debtors also argue that, had Campanile intended one transaction, the 1994 restructuring would have been effectuated with one omnibus amendment similar to the agreement in *Progressive Restaurant Sys-*

*tems, Inc. v. Wendy's International, Inc. (In re Progressive Restaurant Systems, Inc.),* 1997 WL 251508 (W.D.N.Y.1997).

The Lease is not the only relevant document to be considered. While the references to the overall transaction in the Lease may be limited, there are abundant references to the Lease and the other features of the Gateway Practice purchase in the other transaction documents, including the AAA (to which the Lease itself is an exhibit and one of several documents required to be executed as a condition to closing).

Campanile asserts, in his affidavit, that the "Lease and the leasing of the veterinary hospital to the Debtor was but one part of the single overall transaction providing for the sale of the practice to the Debtor." The sale of a practice as a going concern in the same location clearly necessitates a link between the asset (or stock) sale and a lease (or real estate sale). Indeed, the documentary evidence leads to the inescapable conclusion that the Note and Lease are essential elements of a single transaction. The Note, according to the affidavit, is another "essential part of the bargain for the sale to the Debtor." Campanile asserts in his uncontroverted affidavit that Kopel understood and accepted the unified nature of the transaction.

The Preliminary Statement and section 1.01 of the AAA describe the transaction as one in which Campanile would sell the practice and his wholly owned corporation would lease the Building. Both the Note, representing the bulk of the purchase price, and the Lease were annexed as exhibits to the AAA, and the execution of both agreements was a condition precedent to closing under the AAA.[5] Furthermore, the Lease and the Note were initial-

**5.** Although the dependence of the AAA on the execution of these other documents does not require the conclusion that one agreement would not have been executed without the other, *cf. Byrd v. Gardinier, Inc. (In re Gardi-* *nier, Inc.),* 831 F.2d 974, 976 (11th Cir.1987), the conditions do evidence the intent of the parties that the Gateway Practice be sold as a going concern.

ly coterminous (15 years), and the AAA included a provision that Kopel would continue to operate the Gateway Practice for at least 15 years.[6] Finally, the Lease itself restricts the use of the Building to the operation of a veterinary practice.

The cross-default provision in the Lease must, in light of the documentary evidence and the Campanile affidavit, be regarded as a necessary term, the absence of which would have halted the sale. Had the cross-default provision been absent from the Lease, Campanile's one essential condition to the sale—that he be entitled to step in quickly and operate the business in the event of any default—would have been thwarted. Campanile's right to repossess the assets pursuant to the Pledge Agreement would have been of limited value without the corresponding entitlement to operate from the Building.

▌ The fact that legally separate entities are parties to the various contracts does not of itself preclude enforcement of the cross-default provision.[7] See *Madison's Partner Group*, 67 B.R. at 635. While enforcement of a cross-default provision in a lease generally should not inure to the benefit of a third party, Overbaugh is not attempting to use section 365(b) to extract priority payments for unrelated obligations. Instead, the cross-defaults are

being asserted to protect the very essence of the bargain made with Debtors by the landlord and its principal. Overbaugh entered into the Lease to facilitate a larger transaction, not simply to collect rent. Kopel has not even argued that he could have entered into the Lease without also entering into the Non–Lease Agreements. Where documents are contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements, the fact that nominally distinct parties executed the agreements will not preclude enforcement of a cross-default provision in favor of a party whose economic interests are identical to those of the entity that is party to the document containing the cross-default provision.[8]

To be sure, enforcing the cross-default provision and requiring the cure of any defaults under the Note will hamper Debtors' reorganization. Debtors, instead of modifying the Campanile Entities' unsecured claim, will be forced to cure the significant arrears under the Note upon assumption of the Lease and to continue making payments under the Note if they wish to remain in the Building. Under the circumstances of this case, the Court can "discern no federal policy which requires severance of a lease condition solely be-

---

6. Cf. *Moore v. Pollock (In re Pollock)*, 139 B.R. 938, 941 n. 6 (9th Cir. BAP 1992) (separateness of the agreements evidenced by the fact that there were not coterminous); *In re Karfakis*, 162 B.R. 719, 725 (Bankr.E.D.Pa.1993) (fact that contracts were coterminous considered in determining that the parties intended the two contracts to constitute a single contractual agreement).

7. Kopel is a party to each of the documents here at issue. Each of the Campanile Entites is a party to the AAA. Campanile, individually, is the counterparty to the Consulting Agreement. Campanile PC is the counterparty to the Note and Pledge Agreement. Overbaugh is the counterparty to the Lease. Campanile is the sole principal of all of the Campanile Entities and, thus, the economic benefits of all of the agreements ultimately inure to him.

8. Debtors rely heavily on *Garrett Road*, 1988 WL 98777, in arguing that the enforcement of the cross-default provision would violate federal bankruptcy policy. In that case, the court found three factors to be dispositive in its holding that enforcement of the cross-default provision would violate bankruptcy policy. First, the court noted that the only connection between the sublease and the purchasing agreement was the cross-default provision. Second, the non-debtor obligees were distinct entities. Finally, the non-debtor had superior bargaining power. *Garrett Road* is readily distinguishable because, here, the Note and the Lease are essential elements of one transaction. The myriad of cross-references and the extrinsic evidence offered by Campanile permit no other reasonable conclusion. Nor is there any evidence of significant inequality of bargaining power.

cause it makes a debtor's reorganization more feasible." *Easthampton Sand & Gravel,* 25 B.R. at 199.[9] Here, no federal bankruptcy policy is offended by enforcing the cross-default provision linking the Note and the Lease. Accordingly, Debtors must cure, or provide adequate assurances of the prompt cure of, the arrears under the Note in connection with the assumption of the Lease.

### B. *The Lease and the Consulting Agreement*

■ Debtors contend that the Consulting Agreement should not be considered part of an integrated transaction including the Lease because the Consulting Agreement is supported by independent consideration (future consulting services) and because, prior to the 1994 Amendment, it made no reference to the Lease. The Campanile Entities assert that the Consulting Agreement is part of the integrated transaction. The connection between the Consulting Agreement and the Lease is not as obvious as the interrelation of the Note and the Lease. Whereas the Note and the Lease are clearly necessary elements of the sale of the Gateway Practice, the Consulting Agreement could be construed as a contract for future employment services and thus not as an essential part of the transaction. Whether to enforce the Lease provision that renders a Consulting Agreement breach a default under the Lease thus turns on whether the parties would have entered into the Lease absent the Consulting Agreement.

■ Both of the parties' interpretations of the contracts, absent extrinsic evidence, are reasonable. The inquiry, then, is analogous to the interpretation of an ambiguous contract. The fact that a contract is ambiguous does not, however, always create a triable issue of fact. *See Mellon Bank, N.A. v. United Bank Corp. of New York,* 31 F.3d 113, 116 (2d Cir. 1994) (for ambiguity in a contract to preclude summary judgment, "there must also exist relevant extrinsic evidence of the parties' actual intent"). Significantly, the Campanile Entities have offered relevant extrinsic evidence in support of their position. Debtors, however, have not.

The only relevant extrinsic evidence in the record is Campanile's uncontroverted affidavit. The documentary evidence is, overall, consistent with the parties' understanding, as described in the uncontrovert-

---

9. Debtors attempt to distinguish *Easthampton Sand & Gravel* on the ground that, in that case, it appeared that the parties intended the lease to be security for the note. *See Easthampton Sand & Gravel,* 25 B.R. at 199 n. 6. Here, the Note was intended to be secured by the Pledge Agreement and not the Lease. Thus, they argue, the cross-default provision is unenforceable. *See In re Pampoukidis,* 104 B.R. 576, 578–79 (Bankr.D.Conn.1989). However, nothing in *Easthampton Sand & Gravel* leads this Court to conclude that a cross-default provision in a lease should be enforced only if the lease was intended to be security for a note. Indeed, one court has held to the contrary and permitted the assumption of a lease notwithstanding a default under a related note where the bankruptcy court found that the parties intended the lease to function as security for the note. *See Moore v. Pollock (In re Pollock),* 139 B.R. 938 (9th Cir. BAP 1992). Securing a note with a lease merely entitles the landlord to an additional secured claim for the value of the lease. *See* 11 U.S.C. § 506(a).

The Court recognizes an anomaly created by the structure of the Gateway Practice purchase transaction. Had the Campanile Entities sold rather than leased the Building and taken a mortgage for the entire sale price, Debtors would have been able to modify their obligations, bifurcating Defendants' claim into secured and unsecured portions, had they been able to propose a confirmable plan to that effect. *See id.* Because the lease is an executory contract that must be current to be assumed, rather than a mortgage that could be modified in a confirmed plan, Defendants are entitled to a cure of the Note arrears even if the total of the arrears and balance of the Note exceeds the value of the collateral. The disparity in treatment is not unique to this situation. A debtor cannot modify the terms of the lease, and must cure defaults upon assumption, even where the current market rate for the leased property is below the contract rate. The Bankruptcy Code itself mandates this "preferential" treatment for lessors.

ed Campanile affidavit, that there was one unified transaction.[10] Not only was entry into the Consulting Agreement a condition precedent to the execution of the AAA, but the non-competition provision expressly referred to in the AAA is found in the Consulting Agreement.

A careful review of the Consulting Agreement in the context of the Gateway Practice purchase transaction and in light of the Campanile Affidavit leads to the conclusion that the principal purposes of the agreement were to provide Campanile, the principal of Overbaugh and Campanile P.C., with ongoing cash income from the practice in addition to payments from the Note and Lease, to reinforce the legal predicate for the non-competition agreement protecting Kopel's interest in the business, and to provide Campanile with a continuing connection with the business during a substantial portion of the payment period under the Lease and the Note. Campanile, according to his affidavit, depends on the ongoing income generated by the Gateway Practice transaction to support his family. The Consulting Agreement is but one of several agreements that together provide for the income stream; the terms of the Consulting Agreement strongly support this conclusion. Unlike an ordinary employment agreement providing for a fixed salary, no particular services or times of work are specified. Campanile is merely required to be "available" at mutually acceptable times to for consultation. Consulting Agreement § 2. The agreement provides that Kopel's only remedy for Campanile's breach of the non-competition provision of the Consulting Agreement is to reduce (not even eliminate) the payments owed under that agreement. Moreover, the amendment to the Consulting Agreement, while acknowledging that Campanile had

moved to Arizona and reducing the annual consulting payments from $40,000 to $38,000, increased Campanile's aggregate income payable under the Consulting Agreement (by approximately $2,600) because of the extension of its term by approximately four months.

As evidenced by the transaction documents and the uncontroverted extrinsic evidence, the Consulting Agreement was a fundamental part of this transaction; enforcement of the cross-default provision between the Lease and Consulting Agreement thus would not offend federal bankruptcy policy. Debtors must therefore cure (or provide adequate assurances of the prompt cure of) the default under the Consulting Agreement as a condition to the assumption of the Lease.

## II. *Perfection and Avoidance of Security Interest*

 Debtors' complaint seeks to avoid Campanile P.C.'s purported security interest in Kopel P.C.'s assets. In support of their motion for summary judgment, Debtors have submitted lien searches demonstrating Campanile P.C.'s failure to file U.C.C. financing statements with either the Secretary of State in Albany, New York or with the Kings County Clerk's Office. The Campanile Entities concede that they can find no evidence that financing statements were filed. They argue that, if the liens are avoided, the other secured creditors should not move up in priority.

The Pledge Agreement and section 3.04 of the AAA grant Campanile P.C. a security interest in most of the assets held by Kopel P.C.[11] Kopel P.C. seeks to avoid this security interest. Pursuant to sections 544 and 1107 of the Bankruptcy Code, a debtor

---

10. Campanile asserts, in his affidavit, that Kopel understood the documents to constitute an integrated transaction. This fact is uncontroverted. Debtors' failure to adduce evidence creating a genuine issue of fact makes summary judgment in the Campanile Entities' fa-

vor appropriate. *See Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 299–300 (S.D.N.Y. 1997), *aff'd,* 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998) (table).

11. *See supra,* n. 1.

in possession may avoid a transfer of property that could have been avoided by a hypothetical creditor obtaining a judicial lien at the commencement of the case. 11 U.S.C. § 544(a)(1). The creation of a security interest is a transfer of property. *See* 11 U.S.C. § 101(54).

Article 9 of the New York U.C.C. governs the creation of security interests in personal property. A security interest is perfected when it attaches and all other applicable steps for perfection are taken. Attachment occurs when the debtor has signed a security agreement covering the collateral, value has been given and the debtor has rights in the collateral. N.Y. U.C.C. § 9–203. A financing statement is necessary for the perfection of security interests unless the U.C.C. provides otherwise. *See* N.Y. U.C.C. § 9–302(1). The Campanile Entities concede that no financing statement has been filed. No exceptions to the requirement that a financing statement be filed are applicable here. Accordingly, the security interest has attached but is unperfected.

An unperfected security interest in assets is subordinate to a judicial lien on the same assets. N.Y. U.C.C. § 9–301(1)(b). Therefore, under section 544(a)(1), Campanile P.C.'s unperfected security interest is subordinated to Kopel P.C.'s hypothetical judicial lien, and Kopel P.C. may avoid Campanile P.C.'s security interest.

■ Any lien avoided by a debtor in possession is preserved for the benefit of the estate. 11 U.S.C. § 551. When a debtor in possession preserves the lien for the benefit of the estate, the debtor in possession steps into the shoes of the avoided lienor, *see Carvell v. Bank One, Lafayette, N.A. (In re Carvell)*, 222 B.R. 178, 180 (1st Cir. BAP 1998), and acquires the same priority that such avoided lienor's lien had with respect to other creditors' liens. *See In re DeLancey*, 94 B.R. 311, 313 (Bankr.S.D.N.Y.1988).

■ Here, Kopel P.C. has acquired an unperfected security interest. An unperfected security interest is subordinate to a properly perfected security interest. *See* N.Y. U.C.C. 9–301(1); 9–312. Several parties, including at least one insider, allegedly hold perfected liens on property of the estate. Assuming their liens are entitled to priority over Campanile P.C.'s unperfected security interest, the preservation of Campanile P.C.'s lien for the benefit of the estate does not give the estate a first priority lien on Kopel P.C.'s assets.[12]

## CONCLUSION

The Lease, the Note and the Consulting Agreement are all in default. The Court holds that the defaults under the Note and Consulting Agreement must be cured in connection with the assumption of the Lease. The Court further holds that Defendants' security interest in the assets held by Kopel P.C. is unperfected and is avoided for the benefit of the estate. With respect to Plaintiffs' First Claim for Relief, relating to the perfection and avoidance of the security interest, Plaintiffs' motion for summary judgment is GRANTED. With respect to Plaintiffs' Second Cause of Action and Defendants' Counterclaim, relating to the enforceability of the cross-default provision and the prerequisites for the assumption of the Lease, Defendants' cross-motion is GRANTED and Plaintiffs' motion is DENIED.

Defendants shall settle an order consistent with the foregoing opinion.

---

**12.** Nothing in this opinion constitutes a determination that those senior liens are valid or not avoidable.