**In re WOLFLIN OIL, L.L.C., Debtor.**

**No. 04–20820–RLJ–11.**

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

Nov. 18, 2004.

Sharon Marie Beausoleil–Mayer, Fulbright & Jaworski L.L.P., Houston, TX, T. Scott Randall, Sprouse, Shrader, & Smith P.C., Amarillo, TX, Don D. Sunderland, Mullin, Hoard & Brown, LLP, Amarillo, TX, David F. Brown, Corbett & Steelman, Irvine, CA, Roger S. Cox, Sanders, Baker & Jesko, PC, Amarillo, TX, David L. Woods, McGuire, Craddock & Strother, Dallas, TX, for Creditors.

Thomas A. Bunkley, Jr., Barras & Bunkley, Amarillo, for Debtor.

### *MEMORANDUM OPINION*

ROBERT L. JONES, Bankruptcy Judge.

The Court considers the Motion to Assume and Reject Leases and Executory Contracts with C.G. Webb ("Webb"), filed by Wolflin Oil, L.L.C. ("Wolflin" or "Debtor"). By the motion, Wolflin seeks authority to reject two leases and assume four leases between it and Webb. Webb contends that the six leases are part of a single integrated transaction and Wolflin must assume or reject all of the leases. A hearing was held September 15, 2004.

This Court has jurisdiction of this matter under 28 U.S.C. §§ 1334(b) and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and FED. R. BANKR. P. 9014.

### Statement of Facts

In May of 1998, TXL, Inc. ("TXL"), a Texas corporation, as seller, and Webb, a principal of TXL, acting as landlord, entered into an Asset Purchase Agreement with Baromitor Petroleum, Inc. ("Baromitor"), a Texas corporation, under which Barometer purchased the assets of TXL for the sum of $1,650,000. TXL conducted an automotive lubrication service business at six separate locations in Amarillo, Texas, owned by and leased from Webb.

As part of the same transaction, on June 9, 1998, Baromitor, TXL, and Webb entered into an Assignment and Assumption of Asset Purchase Agreement with Tibarom, Inc., a Colorado corporation, under which Tibarom was assigned all rights of Baromitor under the Asset Purchase Agreement, with TXL's and Webb's consent. On the same date, June 9, 1998, TXL issued a bill of sale to Tibarom conveying the assets being sold; TXL and Webb signed a non-compete agreement in Tibarom's favor agreeing not to compete, within certain parameters, with Tibarom by operating other automotive quick lube service centers.

To complete the transaction, Webb and Tibarom entered into six separate lease agreements, each dated June 5, 1998, regarding the six business locations, which are described as follows:

1. 7419 W. 34th, Amarillo, Texas (the "34th Street Store");

2. 2801 S. Georgia, Amarillo, Texas (the "S. Georgia Store");

3. 1221 S. Ross, Amarillo, Texas (the "S. Ross Store");

4. 4018 Olsen Blvd., Amarillo, Texas (the "Olsen Store");

5. 4322 W. 45th, Amarillo, Texas (the "45th Street Store"); and

6. 4203 Ridgecrest, Amarillo, Texas (the "Ridgecrest Store").

Almost two years later, in early May 2000, Tibarom, as assignor, and Webb, as landlord, entered into six separate Assignment and Assumption Agreements with Wolflin (the "Assumption Agreements"), under which Wolflin was assigned the six June 5, 1998, leases. By the Assumption Agreements, Wolflin agreed to perform all obligations of the tenant under the leases; Webb released Tibarom from all obligations and liabilities under the leases; and the non-compete agreement dated June 8, 1998, between Tibarom, TXL, and Webb remained in effect for the benefit of Wolflin. The May 1998 Asset Purchase Agreement is not referenced in the Assumption Agreements.

Webb relies on the terms of the Asset Purchase Agreement in contending the leases are part of a single integrated transaction. The Asset Purchase Agree-

ment required that Webb lease the six store locations to Baromitor and that each lease be for a term of twenty years; that the leases provide for a base minimum aggregate rental of $189,000 per year with an increase based upon a CPI adjuster every five years: that assigning or subletting the leases was prohibited without Webb's consent; that the tenant was required to pay all ad valorem taxes assessed against the leased premises; and that all such leases be cross-defaulted so that a material default under any one lease would constitute a material default under all other leases. Regarding the cross-default provision, each lease does indeed provide, at section 5.10(a), that a default occurs upon a failure to pay rent or perform all obligations under any other lease.

Wolflin's operations were relatively profitable its first three years. Chris Welch, principal owner of Wolflin, testified that Wolflin began experiencing financial difficulties in the spring of 2003, because of increased competition. Welch stated that five new quick lube stores opened up in Amarillo thereby reducing Wolflin's market share.

Wolflin filed this chapter 11 proceeding on June 29, 2004, and has, since that date, operated its business and managed its properties as debtor-in-possession. For some time prior to the bankruptcy filing and since the filing, the four stores covered by the leases that Wolflin seeks to assume have been operating at a net profit. On the other hand, the two stores that Wolflin seeks to reject, the Olsen and Ridgecrest Stores, have been operating at a loss. In fact, Wolflin ceased operations at both the Olsen and Ridgecrest Stores. The four stores that Wolflin seeks to assume—the 34th Street Store, the S. Georgia Store, the S. Ross Store, and the 45th Street Store—are newer, more attractive

facilities and are better located than the Olsen and Ridgecrest Stores.

Wolflin is current on its rent on the four profitable stores; it has paid rent through August 2004 on the Ridgecrest Store and through June on the Olsen Store. Wolflin failed to pay the ad valorem taxes on all the leased facilities as required in the leases. On the four sought to be assumed, Wolflin owes taxes in excess of $19,500; on the Olsen and Ridgecrest Stores, the ad valorem taxes are approximately $5,000. Webb has paid the ad valorem taxes on the six stores, thus the amount owing is actually owed to Webb.

Webb was fifty years old when he sold the TXL business in 1998. The purchase price of $1,650,000, which he received at closing, was used to pay taxes and secured debt. The lease payments serve as his retirement income as he has no other retirement benefits.

## Discussion

Although the Bankruptcy Code allows a debtor to assume an unexpired lease, it does so with limitations. *See generally* 11 U.S.C. § 365. First, as the Fifth Circuit reasoned, "the act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services." *In the Matter of Liljeberg*, 304 F.3d 410 (2002) (quoting *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir.2000)). Accordingly, assumption of the lease must represent "a proper exercise of business judgment." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir.1985).

Second, the debtor must ensure that any other party in an unexpired lease "is made whole at the time of the debtor's assumption of said contract.'" *Nat'l Gyp-*

*sum*, 208 F.3d at 505 (quoting *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr. S.D.Tex.1992)). Thus, "[s]ection 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract if (1) the debtor can provide adequate assurance that it, too, will continue to perform, and if (2) the debtor can cure any defaults in its past performance." *Richmond*, 762 F.2d at 1310.

■ Where a lease or contract "contains several different agreements, and the lease or contract can be severed under applicable non-bankruptcy law, section 365 allows assumption or rejection of the severable portions of the lease or contract." *In re FFP Operating Partners, L.P.*, 2004 Bankr.LEXIS 1192, *4–5, 2004 WL 3007079, *1 (Bankr.N.D.Tex.2004) (citing *Stewart Title Guar. Co. v. Old Republic Nat'l Title*, 83 F.3d 735, 739 (5th Cir. 1996)).

### Severability

■ Severable contracts include "two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." BLACK's LAW DICTIONARY (8th ed.2004), *available at http://www.westlaw.com*, Blacks. No set test exists to determine whether a contract is severable. *In re Ferguson*, 183 B.R. 122, 125 (Bankr. N.D.Tex.1995) (citing *Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316, 320 (Tex. App.—El Paso 1982, writ ref'd n.r.e.)). Texas law specifies that a contract's severability depends on three factors: 1) the intent of the parties; 2) the subject matter of the agreement; and 3) the conduct of the parties. *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex.App.—Fort Worth 1991, no writ). The first factor, the parties' intent, is given the greatest weight.

*Stewart Title Guar. Co.*, 83 F.3d at 739. Webb's principal argument is that he subjectively intended and treated the six leases as part of a single, integrated transaction, and thus, as a result, the Court must also so characterize the leases. Webb relies on the cross-default provisions in each of the leases as the best evidence of the parties' intent. The Court first addresses the second and third factors (subject matter and conduct of the parties), as they are, in effect, evidence of the parties' intent.

■ Webb concedes that the subject matter of the leases weighs in favor of divisibility. The Court must "decide if 'the contract can be divided into two or more separate agreements that can be performed independent of each other.'" *FFP Operating Partners, L.P.*, 2004 Bankr.LEXIS 1192, at *15, 2004 WL 3007079, *5 (quoting *In re Convenience USA, Inc.*, 2002 Bankr.LEXIS 348, No. 01–81478, 2002 WL 230772, *6 (Bankr. M.D.N.C. Feb. 12, 2002)). The agreements at hand are six individual building leases, joined together by the cross-default provision contained in each lease. Specifically, the Debtor operates all six of the properties as Jiffy Lube stations. Each store is independently operated. Mr. Welch, currently the managing member of the Debtor, testified that each store has a store manager, an assistant manager, and staff. Although an employee may volunteer his time at another store if needed, each store typically operates independently. Nothing in the lease agreements suggests that each store cannot be operated separately or independently from each other. Considering the evidence, the subject matter of the leases can only point to a finding that the leases are severable and divisible.

■ The Court next considers whether the conduct of the parties indi-

cates a severable contract. Particular attention is paid to the method of payment under the agreement. *See Stewart Title Guar. Co.*, 83 F.3d at 740. A severable contract may exist when "the performance by one party consists of several distinct and separate items and the price paid by the other party is apportioned to each item." *Convenience USA, Inc.*, 2002 Bankr.LEXIS 348, at *3, 2002 WL 230772, at *3. Here, instead of one master payment under the lease, the Debtor pays monthly rent for each store. Indeed, this is a point of contention between the parties—the Debtor is current on rent for the four leases it wishes to assume, but has failed to pay rent for the Olsen and Ridgecrest Stores, the two leases it wishes to reject, since July and September 2004, respectively. Therefore, this factor tips in favor of divisibility, as well.

■■■■ As the Court finds that factors 2 and 3 favor divisibility, the Court considers whether the intent factor, and the weight to be given such factor, overrides the other two factors. The Court first examines the language of the contract itself, as this best evidence of the parties' intent. *Stewart Title Guar. Co.*, 83 F.3d at 739. Where the contract is not ambiguous, parol evidence is not admissible. *See Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653 658 (5th Cir. 1999).

Several provisions of each lease also support a finding of divisibility. First, each lease pertains to different properties in Amarillo, and each lease contains a different rent calculation. Second, section 5.23 of each lease agreement contains a standard merger clause providing: "[t]his Lease, together with EXHIBIT 'A', is the entire agreement of the parties, and there are no oral representations, warranties, agreements, or promises pertaining to this Lease or to EXHIBIT 'A' not incorporated in writing in this Lease." Webb Ex. 5. Further, the plural term "leases" is absent from each of the six documents, and thus no reference is made to the other leases.

■■■■ Despite the foregoing provisions, the cross-default provisions lend support to Webb's argument that the leases are part of a single integrated transaction. In this regard, the Court is mindful that each lease does indeed contain a cross-default provision and the Court is to "carefully scrutinize the facts and circumstances surrounding the ... transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *In re Liljeberg Enterprises, Inc.*, at 445. Cross-default provisions are, in the bankruptcy context, "inherently suspect," but not "per se invalid." *Id.* The Fifth Circuit further stated as follows:

> "[W]here the non-debtor party would have been willing, absent the existence of the cross-defaulted agreement, to enter into a contract that the debtor wishes to assume, the cross-default provision should not be enforced, 'but' enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain.... [w]here documents are contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements, the fact that nominally distinct parties executed the agreements will not preclude enforcement of a cross-default provision in favor of a party whose economic interests are identical to those of the entity that is party to the document containing the cross-default provision."

*In re Liljeberg Enterprises, Inc.*, at 445 (quoting *Kopel v. Campanile (In re Ko-*

*pel)*, 232 B.R. 57, 66–67 (Bankr.E.D.N.Y. 1999)).

In this case, the Debtor was assigned the six leases almost two years after TXL sold the business and Webb assigned the leases to Baromitor. The May 5, 1998, Asset Purchase Agreement outlined the terms of this transaction. The Asset Purchase Agreement specifically required Baromitor to deliver executed leases for the six properties. Tibarom, the immediate assignee to Baromitor, complied with the provisions of the Asset Purchase Agreement and executed a signed lease with Webb for each of the six properties on June 5, 1998, four days prior to the scheduled closing. As stated, the Asset Purchase Agreement additionally required that each of the six leases: 1) be for a term of twenty years; 2) provide for a base minimum aggregate rental of $189,000 per year and each five years during the term of such lease be subject to an increase in rental based upon a CPI adjuster; 3) prohibit assignment or subletting without Webb's consent; 4) require the tenant to pay all ad valorem taxes assessed against the leased premises; and finally, 5) provide for all leases to contain an identical cross-default provision making any default under one lease a default under all six leases. *See* Webb Ex. 1, ¶ 8.1. Webb maintains that of all of these provisions, the cross-default provision in each lease was most essential to the overall agreement. He further testified he would not have entered into the agreement at all had these provisions not been present in the executed leases. To him, this provision provided necessary assurance that his annual $189,000 draw, derived from contri-butions from each location and intended as a retirement fund, would continue.

■ The Court finds it noteworthy, however, that the specific transaction with the Debtor does not include or incorporate the terms of the Asset Purchase Agreement. It does incorporate the non-competition agreement that was entered into in connection with the original transaction between TXL, Webb, and Baromitor, and Tibarom.[1] Webb wants to enforce the cross-default provisions to insure he continues to receive payments on all the leases. Despite Webb's self-serving testimony that he would not have entered into the leases with the Debtor without the cross-default provisions, the Court remains unconvinced. Had Tibarom remained in possession of a portion of the leases while assigning the remainder to the Debtor, the Court cannot imagine any reason for Webb to object. He would have recovered the same aggregate lease payments, albeit from two separate parties. In addition, unlike the agreements in *Liljeberg,* the leases do not compliment each other. In a sense, each leased facility competes with the other leases. Webb is motivated, naturally so, by a desire to maximize his recovery, which is not a sufficient reason for overriding the policy of the Code of allowing debtors to selectively assume or reject the divisible agreements. *See In re Liljeberg* at 445. Accordingly, the Court finds that upon consideration of the three factors, the leases, as between the Debtor and Webb, are divisible and may be selectively assumed or rejected.

■ The Court does not discern a specific objection to or quarrel with the Debtor's business decision to abandon two of

---

1. The Court notes that the non-competition agreement provided that Webb and TXL would not operate a facility that competes with those being operated by, initially, Tibarom, and upon assignment, the Debtor. However, the non-competition agreement was limited to the first sixty months of the lease. Therefore, the non-competition agreement has expired.

the six leases. The evidence establishes that the Olsen and Ridgecrest Stores substantially under performed compared to three of the four other stores from January to December 2003. *See* Debtor's Ex. 1. In particular, the Olsen Store lost almost $10,000 in that same period, while the top three stores averaged in excess of $63,000. *See id.* In 2004, the story is much the same. The Ridgecrest and Olsen Stores averaged losses in excess of $16,000 from January through July of this year. *See id.* All other stores show a profit for this same time frame.

The poor performance of the Olsen and Ridgecrest Stores adversely affects the overall profitability of the Wolflin Oil enterprise. These two stores increasingly lost money from year to year. Consequently, the Debtor's attempt to assume the four profitable stores, while rejecting the leases on the Ridgecrest and Olsen Stores is a proper exercise of business judgment. *Richmond*, 762 F.2d at 1309. The evidence reflects that the closing of these two stores will actually increase the profitability of the remaining four stores, thus insuring the Debtor's continued ability to make the lease payments to Webb for the four assumed stores.

**Cure**

With respect to the four stores sought to be assumed, the Debtor is obligated to satisfy the ad valorem taxes, by reimbursing Webb for his payment of the ad valorem taxes. The Court does not require curing of any missed payments or past due ad valorem taxes on the two rejected leases as a condition to assuming the four other leases. 3 COLLIER ON BANKRUPTCY § 365.05 (15th ed. rev.2004). However, this is not intended to absolve the Debtor from any obligation to pay such sums as may be required under any other provision of the Bankruptcy Code.

**Conclusion**

Because this Court finds rejection of the two leases, specifically the Ridgecrest and Olsen Stores' leases, to be in the best interest of the Debtor, the Court grants the Debtor's Motion to Assume and Reject Leases and Executory Contracts with C.J. Webb. The Court further finds that the Debtor must cure past due ad valorem taxes attributable to the assumed four leases as a condition to assumption.