**In re ADELPHIA BUSINESS SOLUTIONS, INC., et al., Debtors.**

**No. 02–11389 (REG).**

United States Bankruptcy Court, S.D. New York.

March 10, 2005.

---

Weil Gotshal & Manges LLP, by Judy G.Z. Liu (argued), New York City, for debtor-tenant Adelphia Business Solutions Operations, Inc.

Halperin & Associates, by Donna H. Lieberman (argued), Mayer, Brown, Rowe & Maw LLP, by Michael P. Richman, Michelle R. Holl, New York City, Commercial Law Group, P.A., by Michelle M. Suter, Leawood, KS, for lessor Nicholas Abnos.

## *DECISION ON ASSUMPTION AND REJECTION OF UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AT 2001 GRAND BOULEVARD, KANSAS CITY, MO*

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the jointly administered chapter 11 cases of TelCove, Inc., f/k/a Adelphia Business Solutions, Inc., and certain of its subsidiaries (collectively, the "Debtors"), Adelphia Business Solutions Operations, Inc. ("ABSO"), one of the Debtors, has moved pursuant to Bankruptcy Code section 365(a) and FRBP 6006 and 9014 to assume one, and reject another, of two undisputedly closely related leases. More specifically, ABSO has moved to assume the lease governing an annex (the "Annex Lease") and to reject the lease governing floors 2 and 3 of the building (the "Building Lease") at 2001 Grand Boulevard, Kansas City, Missouri. Lessor Nicholas Abnos ("Lessor") objects on the grounds that the two Leases constitute a single integrated contract that cannot be separately assumed and rejected.

Applying Missouri state law, the Court determines that the Leases are separate contracts that can be separately assumed and rejected. As a result, ABSO is permitted to assume the Annex Lease and reject the Building Lease.

## BACKGROUND

On September 18, 2000, Lessor as owner, and ABSO as tenant, executed two leases relating to property situated at 2001 Grand Boulevard, Kansas City, Missouri—one Lease relating to the Annex and another Lease relating to floors 2 and 3 of the Building located at that address.[1] On March 27, 2002, the Debtors commenced voluntary cases in this Court under chapter 11 of the Code.[2] Then on May 15, 2002, ABSO filed the instant Motion for Authorization to Reject Certain Unexpired Leases of Nonresidential Real Property.[3]

On May 24, 2002, Lessor filed a Limited Objection to the Motion to Reject, seeking a clarification of ABSO's intentions with respect to the two leased premises.[4] When this Court held a hearing on the motions, ABSO expressed its intention to assume the Annex Lease and reject the

---

**1.** Memorandum of Law of Nicholas Abnos in Support of Limited Objection to Motion for Authorization to Reject Certain Unexpired Leases of Nonresidential Real Property (Aug. 2, 2004) ("Lessor Brief") ¶ 1; Reorganized Debtors' Memorandum of Law Submitted in Further Support of Their Motion to Reject a Building Lease and Assume an Annex Lease, Each Governing Separate Premises at 2001 Grand Boulevard, Kansas City, Mo. (Aug. 2, 2004) ("ABSO Brief") ¶ 1.

**2.** Lessor Brief ¶ 2; ABSO Brief ¶ 3.

**3.** Lessor Brief ¶ 4; ABSO Brief ¶ 5.

**4.** Lessor Brief ¶ 6; ABSO Brief ¶ 7.

Building Lease.[5] Lessor objected, stating it was his position that the Annex Lease and Building Lease were part of a single integrated transaction that could not be assumed and rejected separately.[6] The Court took the matter under submission,[7] and instructed ABSO to hold rental payments on the Building in escrow until a decision was reached.[8]

## DISCUSSION

■ Sections 365 and 1107 of the Code provide that a debtor in possession may assume or reject any unexpired lease.[9] Generally, in order for an unexpired lease to be assumed or rejected, the lease must be assumed or rejected in its entirety.[10] Lessor argues that the Annex and Building Leases are "part of a single integrated contract that must be assumed or reject[ed] in its entirety."[11] ABSO argues that the Leases "are separate agreements that may be independently assumed or

---

5. Hr'g Tr. at 10:14–11:12.

6. See id. at 15:20–16:13; Lessor Brief ¶ 9.

7. Hr'g Tr. at 17:13–18:8.

8. Id. at 20:20–21:3.

9. See Code sections 365(a), 1107(a); In re Kopel, 232 B.R. 57, 63 (Bankr.E.D.N.Y.1999).

10. See National Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir.1996); AGV Prods., Inc. v. Metro–Goldwyn–Mayer, Inc., 115 F.Supp.2d 378, 390–91 (S.D.N.Y.2000) (citations omitted), aff'd, 37 Fed.Appx. 555 (2d Cir.2002); Kopel, 232 B.R. at 65 n. 4; In re Leslie Fay Cos., Inc., 166 B.R. 802, 808 (Bankr.S.D.N.Y.1994).

However, many courts, including courts in the Southern District of New York, allow a single contract to be separately assumed and rejected if the contract is "divisible" or "severable" under state law. See Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir.1996); In re Gardinier, Inc., 831 F.2d 974, 976–78 (11th Cir. 1987), cert. denied, 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988) (finding one document severable into two agreements for the purpose of separately assuming and rejecting the two agreements); In re Wolflin Oil, L.L.C., 318 B.R. 392, 397 (Bankr. N.D.Tex.2004) ("Where a lease or contract 'contains several different agreements, and the lease or contract can be severed under applicable non-bankruptcy law, section 365 allows assumption or rejection of the severable portions of the lease or contract.' ") (quoting In re FFP Operating Partners, LP, 2004 WL 3007079, at *1, 2004 Bankr.LEXIS 1192, at *4–5 (Bankr.N.D.Tex. Aug. 12, 2004)); In re Cafeteria Operators, L.P., 299 B.R. 384, 389 (Bankr.N.D.Tex.2003) ("[W]here a contract, though contained in a single document, is divisible into several different agreements, some of the divisible agreements may be assumed or rejected under section 365 without assuming or rejecting the entire contract.") (quoting In re Convenience USA, Inc., 2002 WL 230772, at *2 (Bankr.M.D.N.C. Feb. 12, 2002)); In re Plitt Amusement Co. of Wash., Inc., 233 B.R. 837, 847–48 (Bankr.C.D.Cal. 1999); In re Steaks to Go, Inc., 226 B.R. 35, 38 (Bankr.E.D.Mo.1998); In re Holly's, Inc., 140 B.R. 643, 681 (Bankr.W.D.Mich.1992) ("A single writing may contain more than one contract for § 365 assumption-rejection purposes."); In re Cutters, Inc., 104 B.R. 886, 889 (Bankr.M.D.Tenn.1989) ("However, if a document purports to contain a single contract but in reality contains separate severable agreements, then the debtor may reject a severable executory agreement."); In re Brentano's, 29 B.R. 881 (Bankr.S.D.N.Y.1983) (where a single lease covered two floors, permitting the assignment of the lease pro tanto for one of the floors), cited in In re Sanshoe Worldwide Corp., 139 B.R. 585, 596–97 n. 7 (S.D.N.Y.1992) (refusing to regard as a single contract two leases for separate floors of a single office building, thus allowing the debtor lessee to assume and assign the lease for the 11th floor while rejecting the lease for the 9th and 12th floors).

11. Lessor Brief ¶ 25 (apparent typographical error corrected).

rejected."[12]

■ For section 365 purposes, state law governs the interpretation of leases.[13] The parties agree that Missouri law applies to this matter because the Leases contain Missouri choice of law provisions.[14]

■ Under Missouri law, "[s]everal instruments made at the same time, and relating to the same subject matter *may* be read together as one contract . . . . [but] it does not necessarily follow that those instruments are one contract."[15] As a minimum prerequisite, "there must be some reasonable basis for finding that the parties so intended."[16]

■ In determining the parties' intent as to the separateness of the Leases, the Court reviews all relevant evidence, including prior or contemporaneous negotiations and agreements.[17] ABSO argues that Missouri's parol evidence rule would be violated if the Court considered anything beyond the four corners of the two Lease documents.[18] But the purpose of Missouri's parol evidence rule is to preserve the sanctity of written instruments that are fully integrated.[19] The parol evidence rule does not bar evidence relating to the threshold determination of whether the parties intended to integrate their agreements into a single contract.[20]

Here, the relevant evidence includes the affidavit of Jeffrey Thomas Nodland submitted on behalf of ABSO (the "Nodland

---

12. ABSO Brief at 2.

13. *In re S.E. Nichols Inc.*, 120 B.R. 745, 748 (Bankr.S.D.N.Y.1990). *See also Convenience USA*, 2002 WL 230772, at *2; *Plitt*, 233 B.R. at 840–41; *Kopel*, 232 B.R. at 65 n. 4 (citing *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Nichols*, 120 B.R. at 748).

14. Lessor Brief ¶ 27; ABSO Brief at 7. *See also Convenience USA*, 2002 WL 230772, at *2; *Plitt*, 233 B.R. at 840–41; *Kopel*, 232 B.R. at 65 n. 4 (citing *Butner*, 440 U.S. at 54–55, 99 S.Ct. 914; *Nichols*, 120 B.R. at 748).

15. *Greenberg v. Dowdy*, 930 S.W.2d 512, 514 (Mo.Ct.App.1996) (Missouri court's emphasis) (citing *Four–Three–O–Six Duncan Corp. v. Security Trust Co.*, 372 S.W.2d 16, 23 (Mo. 1963); *Merz v. First Nat'l Bank of Franklin County*, 682 S.W.2d 500, 502 (Mo.Ct.App. 1984)). *See also Elliott v. Richter*, 496 S.W.2d 860, 864 (Mo.1973) ("Consequently, even though several instruments relating to the same subject and executed at the same time should be construed together in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute one contract. . . ."); *Howard v. Nicholson*, 556 S.W.2d 477, 480 (Mo.Ct.App. 1977) ("Even if two instruments are executed as part of the same overall transaction, it does not necessarily mean that those instruments constitute one contract or that one contract

has merged with another, absent some reasonable basis for finding that such merger was the intention of the parties.").

16. *Elliott*, 496 S.W.2d at 864 (quoting *Four–Three–O–Six*, 372 S.W.2d at 23).

17. *North American Sav. Bank v. Resolution Trust Corp.*, 65 F.3d 111, 114 (8th Cir.1995) (citing *Paglin v. Saztec Int'l, Inc.*, 834 F.Supp. 1184, 1192–93 (W.D.Mo.1993); *Wulfing v. Kansas City Southern Indus., Inc.*, 842 S.W.2d 133, 146–47 (Mo.Ct.App.1992)); *Missouri Sav. Ass'n v. Home Sav. of America*, 862 F.2d 1323, 1326 (8th Cir.1988) ("The parties' intent regarding the number of documents constituting the contract and the meaning of the contract is determined from the entire instrument or instruments, subsidiary agreements, and relevant external circumstances.") (citing *Missouri Farmers Ass'n, Inc. v. Barry*, 710 S.W.2d 923, 926 (Mo.Ct.App.1986)).

18. ABSO Brief at 12–14.

19. *North American Sav.*, 65 F.3d at 114 (citing *Missouri Sav.*, 862 F.2d at 1326); *Mid Rivers Mall, L.L.C. v. McManmon*, 37 S.W.3d 253, 255 (Mo.Ct.App.2000) (citing *Poelker v. Jamison*, 4 S.W.3d 611, 613 (Mo.Ct.App.1999)).

20. *See North American Sav.*, 65 F.3d at 114 (8th Cir.1995) (citing *Paglin*, 834 F.Supp. at 1192–93; *Wulfing*, 842 S.W.2d at 146–47).

Affidavit") and the affidavit of Joyce Murray submitted on behalf of Lessor (the "Murray Affidavit").[21] In reviewing the Affidavits, the Court determines that no material disputed issues of fact exist. Accordingly, the Court finds, as the parties agree, that an evidentiary hearing is not required.[22] The uncontroverted material facts contained within the Affidavits are all taken as true. These material facts are set forth below.

*The Affidavits*

The Nodland Affidavit includes copies of the actual Leases. In addition, Mr. Nodland provides a short statement highlighting some of the features that distinguish the Leases, observing:

a) the titles of the two Leases differ in that one states "(ANNEX)" while the other states "(BUILDING)";

b) the leased premises are uniquely identified in each Lease, with each Lease corresponding to a separate location;

c) the Annex Lease has a primary term of 15 years while the Building Lease has a primary term of 10 years;

d) the "Net Rentable Footage" in each Lease is different;

e) the "Tenant's Percentage of Operating Costs" in each Lease is different;

f) the Building Lease contains a provision for Lessor to perform certain work on the leased premises prior to occupancy while the Annex Lease does not;

g) the Annex Lease contains a provision for signage while the Building Lease does not; and

h) the cross-default provision of the Annex Lease identifies the Building Lease while the Building Lease cross-default provision identifies the Annex Lease—presumably to suggest that the Leases operate separately enough to require such language.[23]

Mr. Nodland also notes that ABSO planned to use the two locations for separate purposes.[24] "The Annex Lease location is used to house telecommunications equipment necessary for ABSO's service to its end users. The Building Lease location

---

**21.** Mr. Nodland is a Manager of Legal and Regulatory Affairs of ABSO. Nodland Affidavit ¶ 1. Ms. Murray is employed by Zimmer Management Company as a commercial real estate salesperson and was engaged by Lessor to lease the premises at issue. Murray Affidavit ¶¶ 1–3.

**22.** Pursuant to the Court's Case Management Orders, the Court holds evidentiary hearings on motions and applications in contested matters if, but only if, it determines that there exist material disputed issues of fact. Case Management Order # 2, at 2 (Mar. 19, 2003) (ECF docket entry 955); Case Management Order # 1, at 1 (Oct. 18, 2002) (ECF docket entry 611). When the Court offered to hear arguments regarding the potential need for an evidentiary hearing, neither party requested one, and they disclaimed the need for an evidentiary hearing in their briefs. *See* Lessor Brief at 9 ("As such, this Court should find, without the need for an evidentiary hear-

ing, that [ABSO] cannot assume the lease contract in part and reject it in part simply because the contract is set forth in separate Lease Agreements."); ABSO Brief at 17 ("Thus, no extrinsic or parol evidence is required or permitted to interpret, construe, or enforce the Leases, and, accordingly, an evidentiary hearing is not required."). *See also In re Kmart Corp.*, 2003 WL 23147948, at *9, 2003 U.S. Dist. LEXIS 23286, at *28–29 (N.D.Ill. Dec. 24, 2003) (determining that bankruptcy court properly declined to hold an evidentiary hearing on whether two leases were separate for section 365 purposes, noting that the complaining party "never suggested to the Bankruptcy Court that there was relevant disputed extrinsic evidence.").

**23.** Nodland Affidavit ¶ 3. *See also id.* Ex. A, Ex. B.

**24.** *Id.* ¶ 3.

was intended to be used to conduct ABSO's sales operations in the Kansas City area." [25] In addition, Mr. Nodland explains that "ABSO has paid any and all amounts due to Lessor separately, with separate checks, for each of the Leases." [26]

Nothing in the Murray Affidavit disputes the assertions contained in the Nodland Affidavit. Instead, the Murray Affidavit directs the Court's focus to negotiations that preceded the execution of the Leases. For example, Ms. Murray suggests, and it is not disputed, that ABSO pursued the Annex and floors 2 and 3 of the Building simultaneously.[27] In addition, a single lease document was drafted before the parties determined that two documents would be executed.[28] Ms. Murray observes that the two Lease documents "were copies of [the original single lease document] with a slight modification to the title and [a] few other provisions." [29] When Ms. Murray suggested that the original single lease memorialize the single transaction, she learned that "the two documents were only requested for internal bookkeeping purposes of the tenant and that the overall transaction would not change." [30] According to Ms.

Murray: "There was never any negotiation of or even a discussion of two different or distinct transactions. It was always a single transaction." [31] Ms. Murray explains that the parties agreed to include cross-default provisions "to retain the overall transaction notwithstanding the use of two documents." [32]

Ms. Murray also includes a copy of "the single Certificate of Insurance," presumably to suggest that a single insurance policy covered both leased premises.[33] But the Certificate appears to cover only the Building, not the Annex. According to its description, the Certificate concerns "Floors 2 and 3 of (14,785 sq. ft.) The Historic Firestone Building." [34] This supports the separateness of the Leases, not their integration.

As for the actual Leases, Ms. Murray notes the following features:

a) the Leases were executed by the same people, simultaneously; [35]

b) a provision for varying the size of the leased premises refers to the leased premises as containing the cumulative square feet of both premises; [36]

---

25. *Id.* Ms. Murray confirms this: "[ABSO] did not want sales staff close to technology staff and equipment...." Murray Affidavit ¶ 13.

26. Nodland Affidavit ¶ 4.

27. *See* Murray Affidavit ¶¶ 5–24.

28. *Id.* ¶¶ 14–15, Ex. D.

29. *Id.* ¶ 18 (apparent typographical error corrected).

30. *Id.*

31. *Id.* ¶ 24. Ms. Murray also includes a "statement for commissions due on the single transaction," though the statement separately lists the two Leases and notes their different primary terms of 10 and 15 years. *Id.* ¶ 21, Ex. H at 2.

32. *Id.* ¶ 18.

33. *Id.* ¶ 20.

34. *Id.* Ex. G at 1.

35. *Id.* ¶¶ 19, 22.

36. *See id.* ¶¶ 18, 22. The Net Rentable Footage of the Building is 14,783 square feet. *Id.* Ex. E at 2. The Net Rentable Footage of the Annex is 9,500 square feet. *Id.* Ex. F at 3. Section 22.07 is identical in both Leases, stating: *"Variance in Size of Leased Premises.* The rental in this Lease is predicated upon the Leased Premises containing approximately 24,642 square feet of Net Rentable area." *Id.* Ex. E at 22, Ex. F at 22.

c) the initial rent charged and escalation in rent over the entire terms are identical;

d) the Operating Cost Charges are identical, including "an amount not to exceed three (3%) percent of gross revenues from the Building and the Annex for management and administrative costs incurred by [Lessor] in the management and administration of the Building and Annex";

e) the Permitted Uses and General Sales Office Uses in each are the same;

f) both Leases provide that the maintenance of the Annex is at the sole cost of ABSO;

g) both Leases state that "collocation of telecommunications equipment shall not constitute a sublease and additional rental shall not be due to [Lessor] for collocation profits received by [ABSO]";

h) both documents include a provision for the expiration or early termination of the Leases, holding ABSO responsible for restoring all portions of the facilities, including the roof, sprinkler system, and HVAC system in the Annex;

i) both Leases provide for electrical service to the Annex and the Building; and

j) "only one [agency disclosure document] was prepared and signed and copies of it were attached to the two documents." [37]

In addition, the Court notes that both Leases contain the following integration clause:

Section 22.08. *Entire Agreement.* The Lease, the exhibits and rider, if any, set forth all the covenants, promises, agreements, conditions and understandings between Owner and Tenant concerning the Leased Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than as herein set forth. All prior and contemporaneous communications, negotiations, arrangements, representations, agreements and understandings, whether oral, written or both, between the parties hereto, and their representatives, are merged herein and extinguished, this Lease superseding and canceling the same. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Owner or Tenant unless reduced to writing and executed by the party against which such subsequent alteration, amendment, change or modification is to be enforced. If any provision contained in any rider hereto is inconsistent with any provisions of this Lease the provision contained in such rider shall supersede said

---

**37.** *Id.* ¶ 22. But the Court notes that on September 8, 2000 and September 18, 2000, Lessor and an ABSO representative must have signed separate agency disclosure documents because their signatures on each document are slightly different. *Id.* Ex. E at 31–32, Ex. F at 34. In other words, copies of the agency disclosure statement were made before, not after, Lessor and an ABSO representative signed the statements. Also, Ms. Murray observes that Section 1.04(A) of the Building Lease gives rights to the landlord with respect to the Annex, and there is no corresponding provision in the Annex Lease. *Id.* ¶ 23. "It is my experience as a realtor, that if there are truly two separate leases, rights conveyed regarding the subject property would be contained in both of the leases." *Id.* But the Court notes that that same section of the Building Lease describes the Annex as property "which Tenant leases under *separate lease* of even date herewith (the 'Annex Lease')." *Id.* Ex. E at 4 (emphasis added).

Lease provision.[38]

Neither Lease explicitly recites an intention that the two documents be treated as a single contract, though the parties could have easily so provided, if that were their intention.

*Missouri Law*

█ Several of the facts set forth above are not particularly material. Many facts offered by ABSO reflect distinctions without differences, or at least without material differences. And many facts presented by Lessor reflect requirements and concerns that would need to be addressed in each of two unrelated leases just as they would appear in a single lease, or refer to boilerplate that could be expected to be found in any lease. But certain of the facts here have particular significance, and are ultimately determinative.

First, each Lease pertains to separate subject matters because each distinct leased premise is uniquely described in each respective Lease. Second, the Annex Lease has a primary term of 15 years and the Building Lease has a primary term of 10 years, evidencing the parties' understanding that the former Lease could survive in the absence of the latter. Third, consideration is apportioned among the Leases, and rent has consistently been paid and accepted separately.[39] Fourth, the Leases could have easily stated that they were part of a single lease, but they do not. Fifth, the Annex and the Building were insured separately.[40] And sixth, the Leases both contain integration clauses.

█ It is fundamental that whether a contract is severable or entire depends upon the intention of the parties at the time the contract was executed.[41] While the Court considers facts concerning the parties' intentions and actions prior to the execution of the Leases, the Court gives predominant weight to the intentions of the parties at the time the Leases were executed as manifest within the four corners of the Lease. For example, the fact that the Leases had their origins in the concept of a single lease cannot weigh in favor of integrating the Leases into a single lease because the Leases had been separated by the time of execution.[42]

---

**38.** *Id.* Ex. E at 23, Ex. F at 22.

**39.** *See MacArthur v. Commissioner*, 168 F.2d 413, 415–16 (8th Cir.1948) ("A further test of severability is that if the consideration is single the contract is entire, but if the consideration is apportioned the contract may be severable.") (citations omitted).

**40.** *See supra* notes 33–34 and accompanying text.

**41.** *MacArthur*, 168 F.2d at 415–16 (citations omitted); *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 345–46 (S.D.N.Y.1977) ("The issue whether separate documents executed simultaneously should be treated as a single contract is governed by the intent of the parties manifested at the time of contracting and viewed in light of all the surrounding circumstances."). *See also Devils Lake Sioux Tribe v. North Dakota*, 917 F.2d 1049, 1055 (8th Cir.1990) ("[T]he court's objective in interpreting a settlement agreement is to ascertain the actual intent of the parties at the time they executed it."); *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.3d 355, 357 (Mo.Ct.App.2004) ("The cardinal rule for the courts in interpreting a contract ... is to effectuate the parties' intent at the time of contracting. When a contract's language is clear, we discern the parties' intent from the document alone.") (citations omitted); *Southern Real Estate & Fin. Co. v. St. Louis*, 758 S.W.2d 75, 83 (Mo.Ct.App.1988) (citing *Schwartz v. Continental Casualty Co.*, 705 S.W.2d 494, 497 (Mo.Ct.App.1985); *Reddi–Wip v. Lemay Valve Co.*, 354 S.W.2d 913, 920 (Mo.Ct.App.1962)).

**42.** *See Elliott v. Richter*, 496 S.W.2d 860, 864–65 (Mo.1973) (dismissing the significance of an original document that preceded the execution of two separate documents, finding that the original single document was "merely an unsigned memorandum, and from the actions of the parties obviously not intended

 This heightened attention to the time of execution, and the text found within the four corners of the Leases, is supported by the Leases' integration clauses. Under Missouri law, several documents may constitute a single contract even if one of those documents contains an integration clause.[43] But the existence of integration clauses in *both* Leases here is a strong indication that the documents memorialize the parties' final intent to create distinct contracts.[44] The Leases' integration clauses clearly state: "All prior and contemporaneous communications, negotiations, arrangements, representations, agreements and understandings, whether oral, written or both, between the parties hereto, and their representatives, are merged herein and extinguished, this Lease superseding and canceling the same."[45] As a consequence, the integration clauses in the Leases diminish the significance of the prior (or even contemporaneous) negotiations and agreements described by Ms. Murray.[46]

██ Of course, the Court recognizes from the face of the Lease documents that the same parties signed the Leases simultaneously, and that the Leases are related and refer to each other in multiple provisions. But in *Howard v. Nicholson,* the Missouri Court of Appeals noted that "[e]ven if two instruments are executed as part of the same overall transaction, it does not necessarily mean that those instruments constitute one contract or that one contract has merged with another, absent some reasonable basis for finding that such merger was the intention of the parties."[47] In *Howard,* the parties executed an escrow agreement and a financing agreement within eight days of one another for the construction of a building.[48] The court found that the contracts were interrelated instruments.[49] The contracts were even "complementary."[50] But the court refused to merge the separate contracts into one.[51]

With facts strikingly similar to the facts at issue here, the Missouri Supreme Court

to represent the actual contractual document.").

43. *North American Sav. Bank v. Resolution Trust Corp.,* 65 F.3d 111, 115 (8th Cir.1995) (citing *Missouri Sav. Ass'n v. Home Sav. of America,* 862 F.2d 1323, 1326 (8th Cir.1988)).

44. *See Frisella v. RVB Corp.,* 979 S.W.2d 474, 477 (Mo.Ct.App.1998) ("The law presumes that the contract is the final memorial of the parties' agreement and it incorporates all prior and contemporaneous agreements. An integration clause generally confirms the all-inclusive nature of the document.") (citing *Union Elec. Co. v. Fundways, Ltd.,* 886 S.W.2d 169, 170 (Mo.Ct.App.1994)); *CIT Group/Sales Fin., Inc. v. Lark,* 906 S.W.2d 865, 868 (Mo. Ct.App.1995) ("The existence of a merger clause is a strong indication on the face of the contract that the writing is intended to be complete."); *see also Clearly Canadian Beverage Corp. v. American Winery, Inc.,* 257 F.3d 880, 890 (8th Cir.2001); *Planet Prods., Inc. v. Shank,* 119 F.3d 729, 732 (8th Cir.1997).

45. Murray Affidavit Ex. E at 23, Ex. F at 22.

46. *See also In re Wolflin Oil, L.L.C.,* 318 B.R. 392, 399 (Bankr.N.D.Tex.2004) (deciding leases "are divisible and may be selectively assumed or rejected" by declining to give much weight to a landlord's "self-serving testimony"); *Elliott,* 496 S.W.2d at 863–64 (finding the separateness of two contracts in spite of one party's testimony that "it was his intention to enter into only one contract").

47. *Howard v. Nicholson,* 556 S.W.2d 477, 480 (Mo.Ct.App.1977) (citing *Elliott,* 496 S.W.2d at 864; *Four–Three–O–Six Duncan Corp. v. Security Trust Co.,* 372 S.W.2d 16, 23 (Mo. 1963)).

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

in *Elliott v. Richter* considered the legal status of two contracts that were executed on the same day for the sale of adjacent parcels of property.[52] The same three people signed both contracts, except one contract bore the signature of a fourth person.[53] The appellant, one of the three people who signed both contracts, later testified that it had been his intention to enter into only one contract, not two.[54] Despite this testimony, the court refused to find any reasonable basis for concluding that the parties intended for the two instruments to comprise a single contract so that rescission of one would constitute rescission of both.[55]

Significantly, the *Elliott* court refused to be persuaded by a single document that had allegedly expressed the parties' agreements before two documents were executed. "[The single document] is merely an unsigned memorandum, and from the actions of the parties obviously not intended to represent the actual contractual document."[56] Instead, the court found that the contracts were separate because the contracts (1) were not between identical parties (though the parties were predominantly the same); (2) pertained to different subject matters in that each provided for the sale of a distinct parcel of land, even if the parcels were adjacent to one another;

(3) provided for separate consideration to be paid for each; and (4) required delivery of the parcels at different times.[57]

The instant material facts closely resemble *Elliott* in important ways. Although identical parties signed the Leases at issue here, and the parties in *Elliott* were not strictly identical, the Leases resemble the real estate contracts in *Elliott* because the Leases also pertain to adjacent but distinct subject matters (or distinct properties); the Leases provide for separate consideration; and while the Leases may have been delivered at the same time, their primary terms are different.[58]

Lessor relies on two cases—*North American Savings*[59] and *Missouri Savings*[60]—to argue that the Leases constitute a single contract, but the facts of those cases are significantly different from the facts here.

In *North American Savings*, the Eighth Circuit applied Missouri law to determine the separateness of three documents executed simultaneously by the same parties.[61] The three documents included a Letter Agreement, a Loan Participation Certificate, and a Loan Participation Agreement.[62] Significantly, the three documents undisputedly concerned the same

---

52. *Elliott*, 496 S.W.2d at 861–62.

53. *Id.* at 862.

54. *Id.* at 863.

55. *Id.* at 864.

56. *Id.*

57. *Id.*

58. *See also Ponderosa–Nevada, Inc. v. Venners,* 90 S.D. 579, 243 N.W.2d 801, 804 (1976): Although the two instruments under consideration were executed at the same time, and involved the same parties, they pertain to the same subject matter only in the general sense that they both relate to the sale of real property. Each instrument contains a description of separate pieces of property. Additional evidence that the intent was to create separate contracts is evident from the fact that each recites separate consideration and provides for performance on different dates.
*Id.* (citing *Elliott*, 496 S.W.2d at 860).

59. 65 F.3d 111 (8th Cir.1995).

60. 862 F.2d 1323 (8th Cir.1988).

61. *North American Sav.*, 65 F.3d at 112–15.

62. *Id.* at 113.

subject.[63] All three documents expressly discussed the purchase of a participation interest in a loan.[64] The Letter Agreement specifically referred to itself as being a part of the Loan Participation Agreement.[65] And all three documents were regarded as interdependent and necessary to the transaction.[66]

Here, Lessor has made no such showing. The Leases are not inextricably intertwined and interdependent.[67] Instead, the difference in the primary terms of the two Leases—10 years and 15 years—suggests the opposite.[68] The different primary terms plainly demonstrate that the parties intended for the Annex Lease to potentially survive without the Building Lease. Rent has always been paid separately.[69] And the parties knew at the time of the Leases' execution that the purposes of the Leases were different: "[ABSO] did not want sales staff close to technology staff and equipment. . . ." [70]

*Missouri Savings* is also distinguishable. In *Missouri Savings*, the Eighth Circuit applied Missouri law to decide that a letter was part of a single contract because it was integrally related to, dated on the same day as, and related to the same subject matter as documents that were "undisputably part of the contract." [71] As discussed above, the instant Leases are not integrally related.[72] And while the Leases are dated on the same day, they do not relate to the same subject matter because the Leases relate to separate locations.[73]

### Cross–Default Provisions

■ The cross-default provisions in the Leases do not alter this Court's finding that the Leases are separate contracts.[74] In *In re Kopel*, the Bankruptcy Court in the Eastern District of New York noted that even though cross-default provisions were inherently suspect, they were not invalid *per se*.[75] The *Kopel* court noted that where two agreements are "neces-

---

**63.** *Id.* at 115.

**64.** *Id.*

**65.** *Id.*

**66.** *Id.* ("The evidence shows that [Appellant's] board of directors would only agree to let [Appellant] participate in the Triland Loan if [Appellee] guaranteed the first $3 million in actual losses realized by [Appellant, thus requiring the execution of the Letter Agreement]; indeed, it was reasonable for [Appellant] to require such security as it was purchasing a 75.949% interest in a $19,750,000 loan.").

**67.** *See In re Plitt Amusement Co. of Wash., Inc.*, 233 B.R. 837, 847 (Bankr.C.D.Cal.1999) (finding three leases separate for section 365 purposes even though containing cross-default provisions and executed on the same day because "each lease functions independently," relating to different property with different rent and different commencement and termination dates). *Cf. In re Progressive Rest. Sys., Inc.*, 1997 WL 251508, at *3, 1997 U.S. Dist. LEXIS 6668, at *11–12 (W.D.N.Y. May

8, 1997) (having no doubt that certain documents were "inextricably intertwined and interdependent," integrated "into one indivisible and non-severable agreement.").

**68.** *See* Murray Affidavit Ex. E at 1, Ex. F at 1.

**69.** Nodland Affidavit ¶ 4.

**70.** Murray Affidavit ¶ 13. *See also* Nodland Affidavit ¶ 3.

**71.** *Missouri Sav. Ass'n v. Home Sav. of America*, 862 F.2d 1323, 1326 (8th Cir.1988).

**72.** *See supra* notes 67–70 and accompanying text.

**73.** *See supra* notes 23, 57–58 and accompanying text.

**74.** Both parties characterize section 17.01(e) of the Leases as cross-default provisions. Lessor Brief at 5; ABSO Brief at 14–15.

**75.** *In re Kopel*, 232 B.R. 57, 64 (Bankr. E.D.N.Y.1999).

sary" or "essential" or "fundamental" elements of the same transaction, the cross-default provisions found within the two agreements might be enforced.[76]

As previously discussed, the Leases here are not so interdependent. Instead, the Leases here are more similar to the leases in *In re Sanshoe Worldwide Corp.*,[77] a decision in this district. In *Sanshoe*, the same parties executed a lease for the 11th floor and another lease for the 9th and 12th floors of the same building. The *Sanshoe* court dismissed the significance of the cross-default provisions found in both leases as impermissible restrictions on the debtor's ability to assign or reject.[78] Instead, the *Sanshoe* court found as follows:

> [T]he different leases are contracts for separate spaces. They do not have the same subject matter or purpose, and one agreement is not the subsidiary of the other. We find that the leases for different floors should not be construed as a single instrument. Therefore, Sanshoe may validly assign the 11th floor lease, while rejecting the lease for the other floors.[79]

The facts in *Sanshoe* closely resemble the facts here, and the Court follows the *Sanshoe* court's analysis.[80] Accordingly, ABSO's motion to assume the Annex Lease and reject the Building Lease is approved.

SO ORDERED.

---

**76.** *Id.* at 67, 67 n. 8, 69.

**77.** 139 B.R. 585 (S.D.N.Y.1992).

**78.** *Sanshoe,* 139 B.R. at 597 (citing *In re Braniff, Inc.,* 118 B.R. 819, 845 (Bankr. M.D.Fla.1989); *In re Sambo's Restaurants, Inc.,* 24 B.R. 755, 757 (Bankr.C.D.Cal.1982)). *See also In re Wolflin Oil, L.L.C.,* 318 B.R. 392, 399 (Bankr.N.D.Tex.2004) (finding cross-default provisions and the reasons for enforcing them insufficient for "overriding the policy of the Code of allowing debtors to selectively assume or reject the divisible agreements."); *In re FFP Operating Partners, LP,* 2004 WL 3007079, at *4, 2004 Bankr.LEXIS 1192, at *13 (Bankr.N.D.Tex. Aug. 12, 2004) ("The presence of this [cross-default] clause is simply not dispositive."); *In re Convenience USA, Inc.,* 2002 WL 230772, at *2 (Bankr.M.D.N.C. Feb. 12, 2002) ("In the bankruptcy context, it is well established that cross-default provisions do not integrate executory contracts or unexpired leases that otherwise are separate or severable.") (citing *In re Plitt Amusement Co. of Wash., Inc.,* 233 B.R. 837, 847 (Bankr.C.D.Cal.1999)).

**79.** *Sanshoe,* 139 B.R. at 596.

**80.** *See also Plitt,* 233 B.R. at 847.