**In re ANECO ELECTRICAL CONSTRUCTION, INC.,**
Debtor.

No. 8:04–BK–24883–PMG.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

May 27, 2005.

Scott A. Stichter, Esquire, Stichter, Riedel, Blain & Prosser, P.A., Tampa, Florida, for Debtor.

Gregory M. McCoskey, Esquire, Glenn, Rasmussen, Fogarty & Hooker, Tampa, Florida, for Turner Construction Company.

## ORDER ON MOTION FOR AUTHORITY (A) TO ASSUME AND ASSIGN UNEXPIRED SUBCONTRACT WITH TURNER CONSTRUCTION COMPANY TO M.C. DEAN, INC. AND (B) TO REJECT A RELATED SUBCONTRACT WITH TURNER CONSTRUCTION COMPANY

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for hearing to consider the Motion for Authority (A) to Assume and Assign Unexpired Subcontract with Turner Construction Company to M.C. Dean, Inc. and (B) to Reject a Related Subcontract with Turner Construction Company. The Motion was filed by the Debtor, Aneco Electrical Construction, Inc.

The threshold issue in this case is whether the "unexpired Subcontract" that the Debtor seeks to assume and assign, and the "related Subcontract" that the Debtor seeks to reject, are separate and severable agreements, or whether they constitute a single, unified contract that may not be divided and treated separately under § 365 of the Bankruptcy Code.

### Background

The Debtor is an electrical contracting company.

Turner Construction Company (Turner) is a general contractor.

On November 25, 2002, Turner (as the general contractor) and the Debtor (as subcontractor) entered into a Subcontract Agreement, identified as Subcontract # 008, for electrical work at the Washington Dulles International Airport. (Doc. 482, Turner's Objection to Motion, Exhibit "A"). The job to be performed under the Subcontract was described as "Project # 8555, Dulles Package 6, Main Terminal People Mover Station, Dulles, Virginia." The amount to be paid by Turner for the completion of work by the Debtor under the Subcontract was $17,000,000. (Subcontract, Article IV).

The "Scope of Work" to be performed by the Debtor is described in a six-page "Attachment A" to the Subcontract. Section A of the Attachment provides:

#### A. *GENERAL:*

The Work includes all items necessary to provide the Electrical Work for the Dulles Bid Package 6—Main Terminal People Mover Station Project, including all necessary permits, engineering, fabrication, trucking, storage, labor, materials, tools, hoisting, scaffolding, equipment, taxes, overhead, profit, fringe benefits, insurance's, etc.

Section B of the six-page Attachment details specific items covered by the Scope of Work, including subsections entitled "Inclusions" and "Special Instructions."

On November 3, 2003, almost one year after the Subcontract was executed, Turner issued two Subcontract Work Orders to the Debtor. (Doc. 482, Turner's Objection to Motion, Exhibit "B").

One Work Order, identified as Rev. 1A–001, describes the job as "Dulles Package 6, Main Terminal People Mover Station at Washington Dulles International Airport Mobile Lounge, *West APM Station and South Finger.*" (Emphasis supplied). The text of the Work Order provides that the Debtor shall perform all of the electrical work "at the Package 6, Main Terminal People Mover Station, Mobilization, Pro-

ject Submittals and Material Procurement, Temporary Mobile Lounge, West Baggage Systems Modifications, West Hold Room, South Finger, West APM Stations and Temporary Baggage Gallery." Further, the Work Order provides that the Debtor will submit a Performance Bond to Turner in the amount of $11,000,000.

The second Work Order, identified as Rev. 2A–001, describes the job as "Dulles Package 6, Main Terminal People Mover Station at Washington Dulles International Airport *East APM Station*." (Emphasis supplied). The text of the Work Order provides that the Debtor shall perform all of the electrical work "at the Package 6, Main Terminal People Mover Station, West APM Station Finishes, East Hold Room, East APM Station." The Work Order provides that the Debtor will submit a Performance Bond to Turner in the amount of $6,000,000.

Clearly, the specific work covered by Work Order 1A–001 differs from the work covered by Work Order 2A–001.

Both Work Orders, however, identify the Job Number as 8555, and refer to the Master Agreement No. 008. Further, both Work Orders state that the work will be performed "[I]n accordance with Additional Provisions dated [sic] and 'Scope of Work for Electrical' dated, November 25, 2002, attached hereto." Finally, both Work Orders provide that the "terms and conditions of the original Master Subcontract Agreement dated November 25, 2002 for the above work shall govern this order with the Exception of those modifications listed below." (Doc. 482, Turner's Objection to Motion, Exhibit "B").

On November 10, 2003, Safeco Insurance Company of America (Safeco) issued a Performance Bond pursuant to which the Debtor and Safeco were "held and firmly bound unto Turner Construction Company" for the sum of $11,000,000, the amount required by Work Order 1A–001. The prefatory language of the Performance Bond provides:

> Whereas, Principal [the Debtor] has by written agreement dated November 25, 2002 entered into a Subcontract with Obligee [Turner] for the performance of electrical work (hereinafter the Subcontract Work), for and at the 'Subcontract Work Order # 1A (SWO # 1A) for the Temporary Mobile Lounge, West APM Station and South Finger of the Package 6: Main Terminal People Mover Station at Washington Dulles International Airport.'

(Doc. 463, Debtor's Motion, Exhibit "A"). The Performance Bond provides that if the Debtor defaults under the Subcontract, then Safeco will remedy the default, complete the Subcontract, or arrange for a new subcontract with Turner.

On December 30, 2004, almost fourteen months after the issuance of the Work Orders and Performance Bond, the Debtor filed its petition under Chapter 11 of the Bankruptcy Code.

On April 5, 2005, the Debtor and Safeco filed a Complaint against Turner for Specific Performance, Injunctive Relief, Breach of Contract, and Declaratory Relief. (Adv.05–182, Doc. 1, Complaint). In the Complaint, the Debtor and Safeco alleged that Turner is a "general contractor to Aneco under the terms of a $17 million subcontract dated November 25, 2002 for certain electrical work required at the Washington Dulles International Airport." (Complaint, p. 2). The Debtor and Safeco further alleged that the Debtor would probably be unable to complete the electrical work at the Airport, and that the Debtor therefore intended to assume and assign the Subcontract in its Chapter 11 case. Consequently, by virtue of the Complaint, the Debtor sought to compel Tur-

ner to disclose the outstanding balance of the Subcontract, so that the Debtor would be able to assign the Subcontract to a new subcontractor.

On April 26, 2005, three weeks after the filing of the Complaint, M.C. Dean, Inc. (Dean) tendered a written offer to the Debtor to complete "Package No. 6 Project IQK, Main Terminal People Mover Station at Washington Dulles International Airport." (Doc. 463, Debtor's Motion, Exhibit "B"). In the offer, the "base bid" included quotes for the South Finger and the West Station, for a total cost of $9,112,750. A bid for the East Station was expressly excluded from the proposal.

According to the Debtor, Dean will pay the Debtor the sum of $1,000 for its assignment of the contract rights pursuant to Dean's offer. (Doc. 463, Motion, p. 3).

On the same day that Dean tendered its bid, April 26, 2005, the Debtor filed the Motion for Authority to Assume and Assign the Unexpired Contract with Turner, and to Reject a Related Subcontract, that is currently under consideration. (Doc. 463).

In the Motion, the Debtor asserts that the Dulles Airport project is "broken down into two separate, distinct and independent scopes of work, [that] provide for separate consideration, and were to be performed pursuant to the terms of two separate and independent work orders." (Doc. 463, p. 2). According to the Debtor, the work orders are "separate, independent and severable contracts for the purposes of assumption and rejection under § 365 of the Bankruptcy Code." In the Motion, therefore, the Debtor requests permission to assume and assign Work Order No. 1A–001 (the Bonded Subcontract), and to reject Work Order No. 2A–001 (the Non–Bonded Subcontract).

Turner opposes the Motion, and contends that Subcontract # 008 between the Debtor and Turner "is one singular, integrated contract and not divisible in parts." (Doc. 482, p. 5). Turner asserts, therefore, that the Subcontract must be assumed and assigned in its entirety, and that the Debtor is not permitted to assume only a portion of the contract and reject the balance. (Doc. 482, p. 5).

### Discussion

The threshold issue in this case is whether the Work Orders represent two independent contracts that may be treated separately under § 365 of the Bankruptcy Code, as contended by the Debtor, or whether the Work Orders are merely incidental to the single, integrated contract between the parties that is evidenced by Subcontract # 008, as contended by Turner.

Section 365(a) of the Bankruptcy Code provides:

**11 USC § 365. Executory contracts and unexpired leases**

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a). Subsection (b) of § 365 sets forth the conditions that must be satisfied for a trustee to assume an executory contract or unexpired lease if there has been a default under the contract.

It is fundamental that an "executory contract may not be assumed in part and rejected in part." *In re Yates Development, Inc.*, 241 B.R. 247, 252 (Bankr. M.D.Fla.1999). "If a contract is executory, it may be assumed only in whole and not in part, and that principle applies to rejection." *In re Hamilton Roe International,*

*Inc.,* 162 B.R. 590, 596 (Bankr.M.D.Fla. 1993). "It is black letter law that an executory contract must be either assumed in its entirety, *cum onere,* or completely rejected." *In re Beverage Canners International Corp.,* 255 B.R. 89, 95 (Bankr. S.D.Fla.2000).

■ Where a contract is "divisible" or "severable" under state law, however, courts generally allow the single contract to be separately assumed or rejected. *In re Adelphia Business Solutions, Inc.,* 322 B.R. 51, 54 n. 10 (Bankr.S.D.N.Y.2005). "Where a lease or contract 'contains several different agreements, and the lease or contract can be severed under applicable non-bankruptcy law, section 365 allows assumption or rejection of the severable portions of the lease or contract.'" *In re Wolflin Oil, L.L.C.,* 318 B.R. 392, 397 (Bankr.N.D.Tex.2004) (quoting *In re FFP Operating Partners, L.P.,* 2004 WL 3007079, at *1 (Bankr.N.D.Tex.)) (citing *Stewart Title Guar. Co. v. Old Republic Nat'l Title,* 83 F.3d 735, 739 (5th Cir. 1996)).

■ The severability of a contract is generally determined according to state law. In this case, however, the Subcontract between the Debtor and Turner does not clearly set forth a choice of law provision. (The General Contract between Turner and Metropolitan Washington Airports Authority is not in the record.) Consequently, it is difficult to determine which state's law should govern the interpretation of the Subcontract.

At the hearing on the Debtor's Motion, however, both parties referred to the decision of the Eleventh Circuit Court of Appeals in *In re Gardinier,* 831 F.2d 974 (11th Cir.1987). In *Gardinier,* the issue was whether an agreement to pay a broker, as contained in a prepetition Contract for Sale of Real Estate, was a "distinct, separate and fully executed agreement

that could not be assumed postpetition." *In re Gardinier,* 831 F.2d at 975.

■ The Eleventh Circuit found that the intention of the parties was the controlling principle in determining whether the brokerage agreement and the sales contract were separate and distinct, or whether they constituted a single contract. *Id.* at 976. The Eleventh Circuit further found that three factors are generally persuasive in determining the parties' intent in connection with the severability of a contract: (1) whether the nature and purpose of the agreements are different; (2) whether the consideration for each agreement is separate and distinct; and (3) whether the obligations of each party are interrelated. *Id.* See also *In re Apache Products Company,* 293 B.R. 545, 547 (Bankr.M.D.Fla.2003).

### Application

■ In this case, the Court finds that the Subcontract Agreement entered by the Debtor and Turner on November 25, 2002, constitutes a single, indivisible contract for electrical work at the Dulles International Airport, and that the subsequent Work Orders did not effect a severance of the contract into two separate and independent "subcontracts."

First, the clear purpose of the contractual relationship was the completion of the electrical work on the entire "Package 6, Main Terminal People Mover Station" at the Washington Dulles International Airport. The Subcontract dated November 25, 2002, states, for example:

The Subcontractor shall perform and furnish *all* the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for Electrical Work as further defined in the Additional Provisions and Scope of Work attached herein. (*hereinafter*

*called the Work* ) for and at the Package 6, Main Terminal People Mover Station (hereinafter called the Project), located on premises at Washington Dulles International Airport (hereinafter called the Premises).

(Subcontract, Article I)(Emphasis supplied). The "Additional Provisions" and "Scope of Work" attached to the Subcontract refer to the Work in its entirety. "The Work includes all items necessary to provide the Electrical Work for the Dulles Bid Package 6—Main Terminal People Mover Station Project." (Attachment "A" to Subcontract, Scope of Work, Section A).

This overriding purpose to complete the entire Project is also evidenced in the Subcontract Work Orders issued in November of 2003. The Work Orders refer to Job Number 8555 and Master Agreement No. 008, the identification numbers on the Subcontract. The Work Orders also state that they are governed by the terms and conditions of the Subcontract, unless specifically provided in the Orders, and that the Work performed under the Orders shall be "in accordance with" the Additional Provisions and Scope of Work attached to the Subcontract.

There is no indication in the Work Orders that they were intended to stand alone, independent of the original Subcontract.

Second, the Work Orders do not provide for separate and distinct consideration, apart from the total consideration provided in the Subcontract. As set forth above, the Subcontract states that Turner will pay the Debtor the sum of $17,000,000 "for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement." (Subcontract, p. 2).

The Work Orders, on the other hand, do not address the payment of any consideration in exchange for Work performed by the Debtor on the Project. Instead, the Work Orders state only that the Debtor shall submit to Turner a 100% Performance and Labor and Material Bond in the amount of $11,000,000 and $6,000,000, respectively. In other words, the Work Orders only allocate the consideration set forth in the Subcontract for purposes of obtaining performance bonds. The Work Orders, however, do not alter the Subcontract price in any respect. The amount and timing of the consideration paid by Turner for the Debtor's Work continues to be governed by the terms of the Subcontract.

Finally, the obligations of the Debtor and Turner under the Subcontract and both Work Orders are clearly interrelated.

The parties' contract in this case is readily distinguishable from the arrangement that was presented to the Court in *Gardinier*. In *Gardinier*, the Court found that the debtor's agreement to pay a real estate brokerage commission was separate and distinct from the debtor's agreement with its buyer to sell a parcel of real property, even though both agreements were contained in a single "Contract for Sale of Real Estate." *In re Gardinier*, 831 F.2d at 976. In so finding, the Eleventh Circuit Court of Appeals expressly determined that the obligations of all of the parties were not interrelated, because there were "no promises running between the broker and the purchaser; their only relation is that each has separate contractual rights with the seller." *Id.*

In this case, however, the Debtor's obligation pursuant to the Subcontract and Work Orders is to complete the electrical Work on the Dulles Airport premises, and Turner's obligation pursuant to the documents is to pay the Debtor upon its satisfactory performance of the Work. The obli-

gations involve the same two parties and the same construction project, known generally as the "Dulles Package 6—Main Terminal People Mover Station." The obligations of the Debtor and the obligations of Turner are mutually dependent and clearly interrelated.

Unlike the situation in *Gardinier*, therefore, the Subcontract does not create any obligations that are owed by the Debtor to a third party, independent of the Debtor's obligations to Turner on the Dulles project.

Based on the factors discussed above, the Court concludes that the Debtor and Turner intended to make a single, nonseverable agreement governing the electrical work to be performed by the Debtor at the Dulles International Airport.

Essentially, the Court agrees with the position initially taken by the Debtor when it filed the Complaint that commenced Adversary Proceeding Number 05–182. In that Complaint, the Debtor alleged that Turner was the general contractor to the Debtor "under the terms of a $17 million subcontract dated November 25, 2002," that the Subcontract "entails performance of work over an extended period of time," that the Subcontract was an executory contract within the meaning of § 365 that the Debtor intended to assume and assign, and that the Work Orders represented two "phases" of the same Subcontract. (Adv. No. 05–182, Complaint, Paragraphs 3, 6, 8, 11). The Complaint contains no indication that the Subcontract actually consisted of two separate and severable agreements relating to the Dulles project.

## Conclusion

The Subcontract entered by the Debtor and Turner on November 25, 2002, is a single, unified contract, and may not be divided into two separate and severable agreements represented by Work Order 1A–001 and Work Order 2A–001.

The Court finds that the parties intended to enter into one comprehensive contract for the performance of electrical work on the Dulles Airport project. The parties' intent is evidenced (1) by the overriding purpose of the agreement to complete all of the electrical Work on Dulles Package 6, (2) by the parties' agreement to a contract price in the total amount of $17,000,000, and (3) by the interrelation of the parties' mutual obligations under the Subcontract.

Since the Subcontract constitutes a single contract that cannot be divided and treated separately under § 365, the Debtor's Motion for authority to assume and assign a portion of the contract, and to reject a separate portion of the contract, should be denied.

Accordingly:

**IT IS ORDERED** that the Motion for Authority (A) to Assume and Assign Unexpired Subcontract with Turner Construction Company to M.C. Dean, Inc. and (B) to Reject a Related Subcontract with Turner Construction Company, filed by the Debtor, Aneco Electrical Construction, Inc., is denied.